Le Roy B. JONES et al., Appellants,

v.

UNKNOWN AGENTS OF the FEDERAL ELECTION COMMISSION et al., Appellees.

No. 77-2093.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 27, 1978.

Decided Aug. 23, 1979.

---

David S. Heller, New York City, a member of the bar of the Supreme Court of Wis., pro hac vice, by special leave of the court, with whom Joel D. Joseph, Washington, D.C., was on the brief, for appellants.

Charles N. Steele, Associate Gen. Counsel, and Barbara Van Gelder, Atty., Federal Election Commission, Washington, D.C., with whom William C. Oldaker, Gen. Counsel, Federal Election Commission, Barbara Allen Babcock, Asst. Atty. Gen., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellees.

866

Before McGOWAN and TAMM, Circuit Judges, and JUNE L. GREEN,* District Judge.

Opinion for the court filed by Circuit Judge McGOWAN.

McGOWAN, Circuit Judge:

This is an appeal from an order of the District Court dismissing a suit in which appellants—the United States Labor Party (USLP), the Committee to Elect Lyndon La Rouche (CTEL), and ten individuals who contributed to CTEL in 1976 (individual appellants)—sought damages and injunctive relief against appellees, the Federal Election Commission (Commission) and various members of its staff.[1] The suit was filed after the Commission concluded, on the basis of field interviews with CTEL contributors (including nine of the ten individual appellants), that Lyndon La Rouche, a candidate for the 1976 Presidential nomination of the USLP, had not raised the requisite amount of contributions to qualify for matching funds under the Presidential Primary Matching Payment Account Act (Act), 26 U.S.C. §§ 9031–9042 (1976).

In the District Court, appellants asserted numerous constitutional, statutory, and common law claims arising out of both (1) the fact that the Commission conducted field interviews at all, and (2) the manner in which the interviews were conducted and the scope of the questions asked. The District Court, finding merit in none of these claims, denied injunctive relief and granted appellees' motion for summary judgment.

On appeal, appellants renew their allegations, with particular emphasis on their statutory, first amendment, and fourth amendment claims. Our task is to determine whether, on a reading of the record most favorable to appellants, appellees were

entitled to a judgment as a matter of law. For reasons stated below, we conclude that the District Court erred in granting summary judgment with regard to (1) appellants' statutory claim that the Commission is not empowered to inquire during field interviews into issues bearing no relation at all to the subject matter of an otherwise legitimate investigation into a candidate's eligibility to receive primary matching funds, and (2) appellant Jones' fourth amendment claim that he was subjected to a warrantless seizure of certain financial documents and bank records. In all other respects, we affirm the decision under review.

I

On October 14, 1976, Lyndon La Rouche wrote the Commission requesting primary matching funds for his campaign for the USLP Presidential nomination. One of the eligibility requirements for such funds is that a candidate "certify" that he has received in excess of $5000 in contributions of $250 or less in each of at least 20 states. 26 U.S.C. § 9033(b)(3)–(4) (1976). For these purposes, the Act defines the term "contribution" as a "gift of money made by a written instrument which identifies the person making the contribution by full name and mailing address." *Id.* § 9034(a). La Rouche, in support of his application, submitted a notarized statement that he had raised the requisite amount, but provided no documentation of his contributions. Pursuant to inquiries by the Commission staff, CTEL, La Rouche's principal campaign committee, later submitted a computer printout listing contributions in excess of the threshold. But, once again, the Commission received no underlying documentation of the contributions.

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. This appeal was consolidated for purposes of oral argument with *Committee to Elect Lyndon La Rouche v. Federal Election Commission*, No. 77–1184, and *Federal Election Commission v.*

*Committee to Elect Lyndon La Rouche*, et al., No. 77–1987, decided this date.

References herein to the appendix in the instant case are designated as "A." In addition, references herein to the petitioners' appendix and supplemental appendix in No. 77–1184 are designated as "P.A." and "S.A." respectively.

On November 4, 1976, the Commission authorized its staff to conduct a field audit in order to verify La Rouche's eligibility for matching funds. That audit, which took place shortly thereafter at CTEL's headquarters in New York City, revealed that CTEL had in its possession written instruments evidencing campaign contributions in excess of the threshold amount in 18 states and that, with the submission as promised of certain additional documentation, it would soon cross the threshold in two more states, Connecticut and Indiana. But, in addition to this soon to be corrected shortfall, the audit uncovered many instances where contributions made by money order or cashier's checks raised substantial questions as to whether the contributions were in fact made by residents of the states indicated.[2]

The audit also revealed a pattern of heavy last-minute contributions from persons listing their occupation as that of "volunteer coordinator" for the National Caucus of Labor Committees (NCLC), an organization that, during the last two weeks of the eligibility period, received payments from CTEL of more than $310,000.[3] It further indicated that CTEL shared office space and common personnel with NCLC and three other organizations (New Solidarity International Press Service, Inc., Campaigner Publications, Inc., and the United

States Labor Party) and that those organizations accounted for 78% of CTEL's expenditures and 97% of its debt. These findings seemed particularly significant in light of the fact that CTEL had surpassed the $5,000 threshold by only a narrow margin in at least several states.

On the basis of these findings, the Commission staff recommended, by memorandum of December 27, 1976, that the audit be expanded to include the four organizations closely related to CTEL and that individual CTEL contributors be interviewed to verify their contributions. The memorandum was initialed by, among others, defendants Potter, Steele, and Stoltz. At its meeting on December 29, 1976, the Commission voted to expand the audit to include the related organizations.

On January 13, 1977, the staff indicated by memorandum to the Commission that, absent objection, it was prepared to begin confirming contributions by means of field interviews with CTEL contributors. This memorandum was initialed by defendants Costa, Potter, Oldaker, Steele, and Stoltz. On January 14, 1977, after five Commissioners had returned the memorandum and the sixth had not objected, the Secretary of the Commission certified that the staff recommendation had been adopted. The Commission staff, on January 21, 1977, notified CTEL that its contributors soon would be

---

2. For example, the documentation of the contributions to La Rouche's campaign revealed that many of the money orders and cashier's checks were given in patterns that raised substantial statutory questions. Examples are set forth below:
    (1) The following money orders were all drawn from the Bowery Savings Bank in New York City:

| Serial numbers | Date | State Submitted |
|---|---|---|
| 4–114337 | 10/15/76 | Massachusetts |
| 4–114338 | 10/15/76 | Colorado |
| 4–114339 | 10/15/76 | Massachusetts |
| 4–114341 | 10/15/76 | North Carolina |
| 4–114342 | 10/14/76 | Delaware |
| 4–114343 | 10/15/76 | Massachusetts |
| 8–obliterated | 10/08/76 | Connecticut |
| 8–060756 | 10/12/76 | Colorado |
| 8–063400 (or 409) | 10/13/76 | Indiana |

| Serial numbers | Date | State Submitted |
|---|---|---|
| 8–063407 | 10/13/76 | Massachusetts |
| 8–063408 | 8/01/76 | North Carolina |
| 8–06341(?) | 10/08/76 | Colorado |

    (2) The following cashier's checks were all drawn from the Pacific National Bank of Washington:

| 2255209 | 9/28/76 | Washington |
|---|---|---|
| 2255210 | 9/28/76 | Washington |
| 2255217 | 9/29/76 | Oregon |
| 2255218 | 9/29/76 | Oregon |
| 2255219 | 9/29/76 | Oregon |
| 2255220 | 9/29/76 | Oregon |
| 2652293 | 10/05/76 | Washington |
| 2652294 | ? | Oregon |

3. The audit indicated that NCLC volunteer coordinators, who contributed 16% of the total contributions received, accounted for as much

approached for direct verification of their contributions.

During the week of January 26, 1977, six of the Commission's agents—including defendants Allen, Dougherty, Sims, Vance, and Yowell [4]—either did, or attempted to, interview listed contributors (including the ten individual appellants) [5] in three states, Delaware, Massachusetts, and Wisconsin. They obtained the names and addresses of these individuals from the information CTEL had submitted in support of La Rouche's application for primary matching funds. In six cases (appellants Ford, Wayne and Nancy Hintz, Jones, Mazaris, and Toppin), the individuals received personal visits at their homes; in one case (appellant Park), the interviewee was visited at his place of work; and in two cases (appellants Chaplin and Dallas), the interviews were by telephone. Three appellants, Chaplin, Nancy Hintz, and Park, stated that they did not wish to talk, and the agents desisted.

One appellant who spoke at some length during his interview was Le Roy Jones. That interview, according to Jones,[6] proceeded as follows: Shortly after 7:45 on the morning of January 26, 1977, Jones was awakened by his wife who indicated that she had just answered a knock at their door

and that two agents of the Commission wanted to speak with him. Jones went downstairs. One of the agents, who identified himself as Vance and produced his Commission identification badge, asked Jones how much money he had contributed to CTEL and wanted to know the source of the funds.

Jones apparently indicated that he had given at least some money to CTEL, for Vance then asked to see the cancelled checks and inquired when they had been written. When Jones responded that he did not think that he had either bit of information on hand, Vance replied in "an extremely threatening tone" that:

> If you don't give me the exact information I asked for you cpuld [sic] get sentenced up to 10 years in jail and be given a $10,000 fine . . . you've got a nice house here, you wouldn't want to lose it would you?

A. 30–31. Thereafter, Jones, upon searching his records for thirty minutes, turned over to Vance his tax returns and a cancelled check documenting a contribution to CTEL.

Vance is then said to have asked Jones numerous questions about his political affil-

---

as 83.2% of the contributions received during October.

**4.** One of the Commission agents conducting the investigation, Charles Hanshaw, was not named in the complaint.

**5.** It appears that only nine of the ten individual appellants were in fact approached. Although the complaint alleges that the tenth individual appellant, Philip Valenti, was interrogated by two Commission agents at his home, A. 8, appellee Vance states, by affidavit, that he attempted to interview Valenti, but was unable to do so. A. 47–48. Appellant Valenti has not submitted an affidavit in response. In the present posture of this case, we must give precedence to appellee's affidavit over appellants' bare allegations. *See* Fed.R.Civ.P. 56(e).

**6.** This account, which appears in Jones' affidavit, differs markedly from Vance's account. The same interview is described in Vance's affidavit as follows:

> At approximately 8:00 a. m. on January 26, 1977, Mr. Hanshaw and I [Vance] visited the home of LeRoy Jones, at 4 Brandywine Bou-

levard, Wilmington, Delaware. We asked Mr. Jones if he could produce cancelled checks and bank records to verify his contributions, and to permit the FEC to review certain of his checking accounts by signing voluntary release of liability authorizations. Mr. Jones answered our questions and requests without objection. During the interview, Mr. Jones appeared friendly and volunteered information we had not requested. We attempted to question Mrs. Jones, but Mr. Jones interrupted to correct her, and we abandoned the attempt. Prior to our departure, I gave my business card to Mrs. Jones and requested her to contact me should any additional information relevant to our inquiry occur to her.

A. 46. For purposes of reviewing the grant of summary judgment against appellants, we must read conflicting affidavits in a light most favorable to appellants' position. Accordingly, at this juncture, we must assume that the interview took place as Jones has described it.

iations and beliefs, but Jones does not allege that he responded. The questioning next turned to how the USLP raised its money and who its contributors were, and Jones answered these questions to the best of his ability. Then Vance, once again stating the possible sanctions if Jones refused, asked Jones to reveal the bank account numbers of Jones' personal account and that of the USLP and further "demanded" Jones to sign a statement permitting the agents to inspect his bank records. Jones, "in great fear," signed the statements. Finally, Vance questioned Jones in some detail regarding his activities in the USLP and who paid his expenses, though again Jones does not allege that he responded.

At 9:15 A.M., Vance and his partner departed, leaving behind a business card in case Jones or his wife wanted to change their story. Both Jones and his wife, it is asserted, "felt thoroughly intimidated and in fear of loss of security and property were [they] not to comply with Mr. Vance's questions." A. 32. In fact, as a result of the tension experienced during the interview, Jones, a 59-year-old retiree who had had more than twelve heart attacks, later made a special visit to his doctor. During that visit, the doctor took an electrocardiogram for precaution and changed Jones' prescription.[7]

The results of the field interviews revealed that in neither Delaware nor Wisconsin had La Rouche raised the threshold · amount of $5000 or more in contributions of $250 or less. Thus, even though CTEL had submitted, on February 2, 1977, documentation that according to the initial audit would have established La Rouche's compliance with the threshold in the last of twenty states, the Commission, on February 10, 1977, rejected La Rouche's application for primary matching funds on the ground that he had not met the fundraising threshold of section 9033(b)(3)–(4). It is that determination that we today affirm in No. 77–1184.

On April 28, 1977, appellants filed this action in the District Court, seeking various forms of declaratory and injunctive relief and damages.[8] The complaint named as defendants the Commission and ten individuals, including the five staff members who initialed the memorandum seeking authorization for the field interviews and five of the six investigators who conducted the interviews. The complaint also named as defendants "unknown agents of the Federal Election Commission."[9] Appellants' principal allegations were that the field interviews of CTEL contributors were unauthorized by statute and violative of the first and fourth amendments.[10]

Before the District Court had taken any action in the instant case, the Commission, upon reviewing both the results of the inquiry into La Rouche's eligibility for matching funds and various reports of contributions and expenditures required to be filed with the Commission pursuant to 2 U.S.C. § 434, determined that there was reason to believe that the USLP, CTEL, and the other related organizations had violated certain provisions of the federal elections laws in connection with the La Rouche campaign. The Commission by letter notified each organization that it was under investigation

7. We describe in detail the interview with Jones because it contains the most comprehensive array of the questions that allegedly were asked during the field interviews of CTEL contributors. Throughout this opinion, we will refer only to Jones' interview except where the affidavits of other CTEL contributors contain facts bearing on appellants' claims that do not appear in Jones' affidavit.

8. The complaint denominated the suit as a "class action," stating that the "class" included "all contributors" to CTEL in Delaware, Wisconsin, and Massachusetts who were interviewed by Commission investigators. A. 3–5. There is nothing in the record, however, to indicate that appellants took the necessary steps to have the class certified. See Local Rule 1–13(a), (b).

9. It appears that the only agent involved who was not named in the complaint was Charles Hanshaw. See note 4 supra.

10. Appellants also asserted claims under the fifth, sixth, and ninth amendments and the Final Act of the Conference on Security and Cooperation in Europe (the "Helsinki Agreement"), as well as a claim for intentional infliction of emotional distress.

and explained the suspected statutory violations. The letter to CTEL indicated that, *inter alia,* there was reason to believe the CTEL had violated 26 U.S.C. Section 9042(c)(1) by making false statements in its submissions for matching funds. In furtherance of the Commission's investigation into this matter, agents of the Commission began, on or before July 14, 1977, interviewing additional CTEL contributors in the state of Indiana to verify their contributions to the La Rouche campaign.

On June 24, 1977, appellants moved for a temporary restraining order and, in the alternative, for a preliminary injunction, seeking to enjoin the Commission from conducting further personal interviews with contributors to CTEL as part of its continued investigation. The District Court denied appellants' motion.

On July 18, 1977, appellees moved to dismiss the complaint and, in the alternative, for summary judgment. The grounds for this motion were, *inter alia,* that the field interviews were within the Commission's statutory authority and that appellants had failed to state a claim against the individual appellees upon which relief could be granted. Appellees also argued that, in any event, they were individually immune from suit.

On October 25, 1977, the District Court granted the appellees' motion for summary judgment and denied appellants' motion for a preliminary injunction. The District Court found that the actions of the Commission were "reasonable and within the [Commission's] statutory authority." It further concluded that "nothing in the record . . . supports or . . . could support any alleged violation of Plaintiffs' common law, statutory or constitutional rights." [11]

## II

The principal claims for injunctive and monetary relief that we must resolve are appellants' challenges on statutory, first amendment, and fourth amendment grounds to the field interviews conducted both before and after the Commission refused to certify La Rouche's eligibility to receive primary matching funds.[12] Many of the statutory claims, at least those addressed to the fact that the Commission conducted any interviewing at all of CTEL contributors during the certification process, are analyzed, and rejected, in our opinion in *Committee to Elect Lyndon La Rouche v. Federal Election Committee,* 198 U.S.App.D.C. ——, 613 F.2d 834. There we held (1) that section 9036(a) of the Act, when read in conjunction with section 9039(b), permits the Commission to conduct field interviews as part of its task of certifying a candidate's eligibility to receive primary matching funds where the candidate's threshold submission contains patent irregularities suggesting the possibility of fraud,[13] (2) that such irregularities were present in the case of La Rouche's application for matching funds,[14] and (3) that the manner by which the Commission authorized the interviewing of CTEL contributors was procedurally sound.[15] It is unnecessary to repeat here the reasoning underlying our decision in 198 U.S.App.D.C. ——, 613 F.2d 834.

■ Nor need we pause long on appellants' statutory claim that the Commission is without authority to conduct field interviews of individual contributors in connection with an investigation into whether a candidate's principal campaign committee

---

11. Neither the District Court, nor we, reach the question of appellees' official immunity from suit.

12. With regard to appellants' other common law, statutory, and constitutional claims, *see* note 10, *supra,* we conclude, upon careful examination of the record, that the District Court was correct in dismissing these claims for want of any record support.

13. *Committee to Elect Lyndon La Rouche v. Federal Election Commission,* 198 U.S.App. D.C. ——, at —— - ——, 613 F.2d 834, at 842–844 (D.C. Cir. 1979).

14. *Id.* at —— - —— of 198 U.S.App.D.C., at 847–848 of 613 F.2d.

15. *Id.* at —— n. 22 of 198 U.S.App.D.C., at 847 n. 22 of 613 F.2d.

has violated 26 U.S.C. § 9042(c)(1) by making false statements in its matching funds submissions. Section 437g(a)(2) of the Federal Election Campaign Act provides that

> if the Commission, on the basis of information ascertained in the normal course of carrying out its supervisory responsibilities, has reason to believe that . . . a violation [of the Act] has occurred, [it] shall notify the person involved of such alleged violation and shall *make an investigation of such alleged violation* . . . .

2 U.S.C. § 437g (a)(2) (1976) (emphasis added). Although section 437g (a)(2) does not contain an express grant of authority to conduct field interviews, we hold, as we did in No. 77–1184, that such authority is implicit in the Commission's power to "make an investigation of such alleged violation." [16] It is our view, moreover, that the Commission properly invoked that authority here inasmuch as it had more than ample reason to believe, based on information ascertained during the normal course of carrying out its responsibilities under section 9036(a) of ensuring La Rouche's eligibility to receive matching funds, that false statements had been made to the Commission in connection with La Rouche's matching funds submissions.

The statutory and constitutional claims that remain deal not with the fact that the field interviews were conducted at all, but rather with the manner in which the interviews were conducted and the scope of the questions asked. Appellants' statutory claim is that even if the Commission has authority to conduct field interviews, it exceeded that authority here when its agents inquired into matters bearing no relation whatsoever to the Commission's investigations. With regard to the first amendment, appellants argue that their right to political association was impermissibly "chilled" as a result of the number of interviews conducted, the manner in which they were conducted, and the scope of questioning during the

interviews. Finally, appellants assert that the agents of the Commission, in gaining entry into the homes of the individual appellants and access to their financial records, violated the fourth amendment guarantee against unreasonable searches and seizures.

Our task here is to determine whether the District Court properly granted appellees' motion for summary judgment on these claims. In so doing, we must assure ourselves that, on a reading of the record most favorable to appellants, appellees were entitled to judgment as a matter of law.

## A.

Appellants' statutory claim is that even if the field interviews of CTEL contributors were lawfully authorized, the scope of the questions asked by Commission agents during those interviews exceeded the Commission's statutory mandate. It is asserted that much of the questioning had little or no relevance to the purpose of the Commission's investigations, namely, to verify contributions to CTEL. For example, appellant Jones alleges he was asked questions not only about his CTEL contributions, but also about his political beliefs and affiliations as well as his activities in the USLP. Thus, we are urged to conclude that the Commission's statutory mandate imposes some limits on the scope of questioning during an otherwise lawful field interview and that the Commission exceeded those limits here.

Appellees do not argue that the Commission is vested with unbounded authority to inquire into any matters, however irrelevant, during the course of an otherwise lawful field interview. Instead, appellees assert, on the facts presented here, that both sets of field interviews were conducted pursuant to the legitimate purpose of verifying individual contributions reportedly made to CTEL and that all questions asked

---

16. *Id.* at —— n. 16, 613 F.2d at 842 n. 16 (statutory authority to conduct field interviews under the Presidential Primary Matching Payments Act is implicit in Commission's express authority under 26 U.S.C. § 9039(b) "to conduct examinations and audits . . . [and] to conduct investigations . . . which it determines to be necessary to carry out its responsibilities under this chapter").

during the field interviews were "relevant and material" to that purpose. It is appellees' position, therefore, that they are entitled, as the District Court held, to judgment as a matter of law.

We turn first to appellants' claims arising out of the field interviews conducted by the Commission in determining whether to certify La Rouche's eligibility to receive primary matching funds. In this regard, we must determine whether section 9038(b), the source of the Commission's authority to conduct field interviews under the Act, imposes any limits on the scope of questioning during an otherwise lawful field interview, and, if so, whether, on a reading of the record most favorable to appellants, the Commission exceeded those limits here.

It is our view that with regard to the scope of questioning during an otherwise lawful field interview, the Commission's authority under section 9039(b) is broad, but not limitless. Section 9039(b) is, by its own terms, a broad grant of investigative power:

> (b) The Commission is authorized to prescribe rules and regulations in accordance with the provisions of subsection (c), to conduct examinations and audits (in addition to the examinations and audits required by section 9038(a)), *to conduct investigations,* and to require the keeping and submission of any books, records, and information, *which it determines to be necessary to carry out its responsibilities under this chapter.*

26 U.S.C. § 9039(b) (1976) (emphasis added). But section 9039(b) is not a plenary grant of such power, for it authorizes only those investigative acts the Commission deems "necessary to carry out its responsibilities under this chapter." It thus requires that an investigation bear some possible relation to the Commission's responsibilities under the Act.

▇ If this requirement is to have any meaning, we think it must apply not only to the authorization vel non of Commission investigations, but also to the scope of such investigations. It would be anomalous indeed if the Act were interpreted so as to permit the Commission to inquire into matters exhibiting no relevance at all to the Commission's responsibilities simply because these inquiries were part of an otherwise lawful investigation. Accordingly, we construe section 9039(b) to permit the Commission to inquire during its investigations only into those matters bearing at least some possible relation to the Commission's responsibilities under the Act.

▇ Inasmuch as we already determined in No. 77–1184 that the initial set of field interviews of CTEL contributors were lawfully authorized pursuant to the Commission's statutory obligation to ensure La Rouche's eligibility for primary matching funds, we need only decide here whether the questions both admittedly and allegedly asked during those interviews have some possible bearing on the Commission's responsibilities under the Act. Many of the questions that the agents admit having asked, such as whether an individual contributed at all to CTEL, how much he contributed, and what the source of his money was, all have a direct bearing on whether the individual in fact contributed, and contributed his own money, to La Rouche's campaign.[17] These matters fall plainly within the Commission's obligation under section 9036(a) to verify that a candidate has in fact met the fundraising threshold for obtaining primary matching funds where, as in La Rouche's case, the candidate's threshold submission contains patent irregularities suggesting the possibility of fraud.

This same statutory obligation, we think, also justifies, on the facts presented here, a variety of questions allegedly asked concerning the individual appellants' affiliations, activities, and financial relationships with CTEL, NCLC and the USLP. The

---

17. We include in this category of questions the agents' requests both for cancelled checks or other documentation of contributions and for access to bank records. Such information, if provided, would have permitted the Commission to verify CTEL's documentation of the contributions to La Rouche's campaign.

Commission, in processing La Rouche's application for primary matching funds, was confronted with the specter of fraud on the part of individuals associated with CTEL and several related organizations. The Commission's audit of the contributions to CTEL revealed both that numerous last-minute contributions made by cashier's check or money order were given in patterns that raised substantial questions as to whether the contributor in fact resided in the state indicated, see note 2 supra, and that individuals who listed their occupation as that of volunteer coordinator for NCLC contributed a high percentage of the funds received by CTEL during the last two weeks of the eligibility period.

During the course of the audit, the Commission also learned that NCLC received over $300,000 from CTEL during the last two weeks of the eligibility period, that CTEL shared office space and common personnel with NCLC and three other organizations (including the USLP), and that those organizations accounted for 78% of CTEL's expenditures and 97% of its debt. Given this combination of warning signals, we cannot say that the Commission was unjustified in exploring the possibilities of foul play by individuals associated with CTEL and the related organizations. Thus, in light of the facts available to the Commission, and given its obligations under section 9036(a), we see no statutory bar to inquiries such as whether an individual belonged to, organized with, or received funds from CTEL, NCLC, and the USLP, for such inquiries have a direct bearing on the pattern of irregularities and statutory questions raised by the initial audit.[18]

The only other questions that allegedly were asked during the first set of interviews are the inquiries into the political beliefs of the individual appellants.[19] Here we think that appellees were not entitled to summary judgment, for we fail to see any possible relation, however tenuous, between the alleged inquiries and the Commission's responsibilities under the Act. Although the individual appellants' political affiliations with, and organizational ties to, the USLP, CTEL, and NCLC might well have had some bearing on La Rouche's threshold eligibility (given the "warning signals" discussed above), it is hard for us to imagine how their political beliefs would have any bearing whatsoever on La Rouche's eligibility for matching funds or any other responsibility of the Commission under the Act. Accordingly, at least with regard to the alleged inquiries into the political beliefs of the individual appellants occurring during the first set of interviews, we hold that the District Court erred in granting appellees' motion for summary judgment. It is our view that if those inquiries in fact occurred, the Commission exceeded its otherwise broad investigative mandate under section 9039(b).[20]

We turn now to appellants' statutory claim arising out of the second set of interviews, namely that the scope of the questions allegedly asked during the interviews conducted by the Commission as part of its investigation under 2 U.S.C. section 437g(a)(2) into whether false statements had been made in connection with La Rouche's application for matching funds exceeded the Commission's statutory mandate. This claim is, we think, so totally

18. For the same reasons, we find that the questions allegedly asked about the financing of CTEL, NCLC and the USLP also fall within the Commission's investigative mandate.

19. There are two such allegations in the affidavits: (1) appellant Jones asserts that he was asked "numerous questions as to [his] political . . . beliefs," A. 31, and (2) appellant Toppin alleges that during his interview Commission agents "demanded to know if [he] shared the Labor Party's beliefs," A. 104.

20. It appears that the appropriate remedy, if any, in the event that appellants establish on remand that those alleged inquiries in fact occurred is injunctive relief. The Act contains no provision for money damages on a claim that the Commission has exceeded its investigative powers. Similarly, although the Administrative Procedure Act permits any person aggrieved to have set aside agency action deemed "in excess of statutory jurisdiction," it does not create a right to money damages when such action has occurred. See 5 U.S.C. § 706(2)(C) (1976).

lacking in record support that we need not even decide the precise extent to which section 437g(a)(2) restricts the scope of questioning during an otherwise lawful field interview. The only affidavit in the record filed by a contributor who was approached during the second set of interviews is that of David Hoagland. A. 33–34. By his own account, Hoagland asserts only that the Commission agents asked him if he knew what the Commission represented and, when he responded that he did, if he would be willing to examine some documents. After Hoagland refused this request, the agents ended the interview. Inasmuch as we see nothing in Hoagland's affidavit or anywhere else in the record that even remotely suggests that the Commission asked questions that exceeded the scope of the Commission's authority under section 437g(a)(2), we affirm that portion of the District Court's opinion granting summary judgment on appellants' statutory claim based on the second set of interviews.

### B.

■ Appellants also argue that the field interviews, even to the extent authorized by statute, were violative of the first amendment. In this regard, appellants assert that the number of interviews conducted, the manner in which they were conducted, and the scope of questioning during those interviews could have had no foreseeable result other than to chill appellants' right to political association. In response, appellees argue that we must weigh appellants' associational rights against the substantial governmental interests served by conducting the field interviews. In light of the governmental interests involved, we are urged to conclude that, absent any factual showing of harassment against the individual appellants, CTEL, or the USLP, the mere asking of material questions by Commission agents does not rise to the level of a first amendment violation.

It is well settled that political speech is afforded the broadest possible protection under the first amendment. This reflects both our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964), and the fact that "[d]iscussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution," *Buckley v. Valeo,* 424 U.S. 1, 14, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976). Moreover, inasmuch as "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association," *NAACP v. Alabama,* 357 U.S. 449, 460, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958), the first amendment has been held to protect not only political expression, but also political association.

Nor is this right to political association limited only to protection against direct infringements on associational interests. In a line of cases [21] beginning with *NAACP v. Alabama, id.,* the Supreme Court has held that the compelled disclosure of an individual's affiliation with an organization may, standing alone, constitute a serious intrusion on the first amendment right to privacy of association and belief. These cases share the premise that, especially where, as in *NAACP v. Alabama,* an organization can demonstrate a pattern of harassment resulting from prior revelations of its membership, anonymity of membership is often essential for the viability of a dissident or unpopular group. In the same vein, the Supreme Court in *Buckley v. Valeo, supra,* held that the right to political association is implicated in the compelled disclosure not only of organization ties, but also of campaign contributions. The *Buckley* Court reasoned that the right to pool money through contributions falls within the ambit of first amendment protection, because

**21.** *Gibson v. Florida Legislative Comm.,* 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *Bates v. Little Rock,* 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); *NAACP v. Alabama, supra.*

"funds are often essential if 'advocacy' is to be truly or optimally 'effective,'" and because "[f]inancial transactions can reveal much about a person's activities, associations and beliefs." 424 U.S. at 65–66, 96 S.Ct. at 657.

The "compelled disclosure" cases from *NAACP v. Alabama* through *Buckley v. Valeo* recognize that, under certain circumstances, an individual's right to privacy of association may give way to a sufficiently compelling governmental interest for requiring disclosure. Those circumstances are, to be sure, limited, for the governmental interest must (1) survive "exacting scrutiny" and (2) bear "a 'relevant correlation' or 'substantial relation' [to] the information required to be disclosed." *Buckley v. Valeo, supra*, 424 U.S. at 64, 96 S.Ct. at 656. But such a showing can be made. In *Buckley*, for example, where minor parties challenged the provisions of the Federal Election Campaign Act requiring *inter alia* the disclosure of campaign contributions in excess of $100,[22] the Court found three sufficiently compelling governmental interests to uphold the disclosure provisions. Those interests were (1) to provide voters with information regarding a candidate's supporters so as to assist the electorate in evaluating the candidate, *id.* at 66–67, 96 S.Ct. at 612, (2) to "deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity," *id.* at 67, 96 S.Ct. at 657, and (3) to enhance the Government's ability to detect violations of the contribution limitations in the Federal Election Campaign Act. *Id.* at 66–68, 96 S.Ct. 612. In the absence of record evidence of harassment of the sort proffered in *NAACP v. Alabama*, the Court in *Buckley* concluded that the governmental interests in disclosure outweighed the associational interests of the minor parties.

Applying the analysis of the "compelled disclosure" cases to the facts at hand, we have no difficulty concluding that the field interviews of CTEL contributors served governmental interests sufficiently compelling to survive "exacting scrutiny." Two sorts of governmental interests are involved. First, insofar as the interviewing of CTEL contributors was conducted to ensure that La Rouche had met the fundraising threshold for primary matching funds, the field interviews obviously served the same interests as those underlying the fundraising threshold itself. Those interests, as the Court in *Buckley* noted, are (1) "Congress' interest in not funding hopeless candidacies with large sums of public money," and (2) "the important public interest against providing artificial incentives to 'splintered parties and unrestrained factionalism.'" 424 U.S. at 96, 96 S.Ct. at 671.

Second, insofar as the interviewing of CTEL contributors was prompted by a finding of possible fraud in connection with reported contributions to the La Rouche campaign, the field interviews also serve the governmental interests underlying all the provisions of the Federal Election Campaign Act that would be undermined if a candidate or his authorized committee were maintaining records of fraudulent campaign contributions.[23] One such provision is the disclosure requirement upheld in *Buckley*, for it would hardly serve the purposes of that requirement if the disclosures made in response to it were in fact fraudulent. To do so would not assist, but rather mislead, the electorate in evaluating a candidate in terms of his financial supporters. Thus, inasmuch as the governmental interests served by the disclosure requirement, standing alone, withstood "exacting scrutiny" in *Buckley*, it follows *a fortiori* that where, as here, those same interests are combined with the interests underlying the threshold requirement, the governmental

---

22. 2 U.S.C. § 431 *et seq.* (1976).

23. In this regard, we note that the results of the field interviews led not only to the rejection of La Rouche's application for matching funds, but also to a broader investigation into possible violations of the federal election laws in connection with the La Rouche campaign. *See Federal Election Commission v. Committee to Elect Lyndon La Rouche*, 198 U.S.App.D.C. ——, 613 F.2d 849 (D.C. Cir. 1979).

interests served by the field interviews are sufficiently compelling to withstand "exacting scrutiny."

It also appears that, with two exceptions not of decisional significance,[24] there was "a 'relevant correlation'" between the governmental interests and the information required to be disclosed. As we concluded above,[25] the questions admittedly asked concerning the amount, source, and date of the individual appellants' contributions to CTEL had a direct bearing on whether the individuals in fact contributed to CTEL, and thus on whether La Rouche met the fundraising threshold.[26] It was also our view that those questions allegedly asked concerning the individual appellants' affiliations, activities, and financial relationships with CTEL, NCLC, and the USLP were related directly to the pattern of irregularities and statutory questions raised by the initial audit.[27] *Compare Pollard v. Roberts*, 283 F.Supp. 248 (E.D.Ark.) (three-judge court), *aff'd per curiam* 393 U.S. 14, 89 S.Ct. 47, 21 L.Ed.2d 14 (1968). Accordingly, we find a sufficient nexus between the governmental interests underlying the field interviews and the questions allegedly asked during those interviews.

Notwithstanding the substantial governmental interests involved and the direct relation between those interests and the information disclosed, appellants urge us to conclude that in light of the minor party status of the USLP, the field interviews of CTEL contributors amounted to an undue infringement on appellants' associational rights. Appellants do not argue that their status as a minor party diminishes the significance of the governmental interests served by the field interviews. They assert instead that the membership of a minor party is more susceptible to a chilling effect on associational rights than the membership of a major party.

The unique vulnerability of minor parties and their members to infringements on associational rights was recognized in *Buckley v. Valeo*, where the Court noted:

> We are not unmindful that the damage done by disclosure to the associational interests of the minor parties and their members and to supporters of independents could be significant. These movements are less likely to have a sound financial base and thus are more vulnerable to falloffs in contributions. In some instances fears of reprisal may deter contributions to the point where the movement cannot survive.

424 U.S. at 71, 96 S.Ct. at 659. But even so, the Court in *Buckley* held that, absent a

---

**24.** The exceptions are the allegations of appellants Jones and Toppin that, during their interviews, they were asked questions about their political beliefs. *See* note 19 *supra*. We have already held that, absent any possible relation to the Commission's responsibilities under the Act, such questioning, if it in fact occurred, would be in excess of the Commission's otherwise broad investigative mandate under section 9039(b). Accordingly, appellants may be entitled to injunctive relief against questioning of this sort.

But we do not feel that such questioning states a claim upon which relief can be granted in a suit for money damages under the first amendment. It is clear that compelled disclosures may in certain instances rise to the level of a first amendment violation, *see NAACP v. Alabama, supra*, and that the remedy for money damages as in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), applies to first amendment violations, *see Dellums v. Powell*, 184 U.S.App.D.C. 275, 566 F.2d 167 (D.C. Cir. 1977), *cert. denied*, 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978). Nonetheless, where,

as here, there are no allegations that appellants Jones or Toppin answered the questions about their political beliefs, that any sanctions whatsoever were taken against them for their refusal to so answer, that the mere asking of the specific questions at issue chilled their associational rights, or that any of the appellants in this case had been subject to prior harassment by the Commission, we simply cannot say that the District Court erred in concluding that appellees were entitled to judgment as a matter of law on this *Bivens* claim.

**25.** *See* pages —–—— of 198 U.S.App.D.C., pages 872–873 of 613 F.2d *supra*.

**26.** Moreover, we note that many of these questions involved nothing more than verification of information already available to the public under the disclosure provisions of the Federal Election Campaign Act, 2 U.S.C. § 431 *et seq.* (1976).

**27.** *See* pages —–—— of 198 U.S.App.D.C., pages 872–873 of 613 F.2d *supra*.

showing of the sort made in *NAACP v. Alabama*—where an organization had "made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members [had] exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility," 357 U.S. at 462, 78 S.Ct. at 1172—the governmental interests underlying the disclosure provisions of the Federal Election Campaign Act were sufficiently compelling to outweigh the possible harm to the associational rights of minor parties and their members.

Appellants assert that they have been subjected to harassment of the sort present in *NAACP v. Alabama*. In particular, they point both to the number of field interviews conducted and the manner in which they were conducted. It is their view that "such activities conducted on a massive scale could have no foreseeable result other than the chilling of a political party's constitutional rights."

Although the field interviews of CTEL contributors no doubt had some chilling effect on their support of CTEL and the USLP, we disagree that this is a case comparable to *NAACP v. Alabama*. The record in this case is devoid of any evidence of a pattern of past or present governmental harassment against the USLP, CTEL, or their members, for the only alleged harassment is that stemming from the two sets of field interviews in connection with La Rouche's application for matching funds.

The first set of field interviews was initiated by the Commission after it discovered patent irregularities suggesting the possibility of fraud among the reported contributions to the La Rouche campaign, thereby triggering the Commission's obligation under section 9036(a) to ensure that La Rouche had in fact raised the threshold amount to qualify for primary matching funds.[28] The second set of interviews followed from the Commission's determination, on the basis of information ascertained in the normal course of carrying out its supervisory responsibilities under section 9036(a), that there was reason to believe that, in contravention of 26 U.S.C. § 9042(c)(1)(A), false statements had been filed in connection with La Rouche's threshold submission. Section 437g(a)(2) *requires* the Commission, once having made such a determination, to conduct an investigation into the alleged violation.[29] Both investigations thus were lawful agency responses to findings of possible fraud in connection with the reported contributions to the La Rouche campaign.

Nor do we find a pattern of harassment in the fact that the Commission initially did, or attempted to, interview as many as 60 CTEL contributors in three states and later as many as 40 more in another state. Given the Commission's findings of possible fraud, we see nothing unreasonable about its attempting to interview, as an initial matter, approximately 20 CTEL contributors in each of three representative states. Moreover, in light of the fact that many of those contributors were never located, we think it was reasonable for the Commission, as part of its section 437g(a)(2) investigation, to expand the interviewing to include 40 more contributors in another state.

With regard to the manner in which the field interviews were conducted, many of the individual appellants allege that they were harassed or intimidated by the Commission agents. It is our view, however, that the vast majority of the individual appellants fail to allege facts sufficient to suggest that this "chill" amounted to anything more than the natural response that anyone would have if questioned by a federal agent about campaign contributions.[30]

---

**28.** *See* notes 13–14 and accompanying text *supra*.

**29.** *See* page —— of 198 U.S.App.D.C., page 870 of 613 F.2d *supra*.

**30.** No individual appellant, other than appellant Jones, has alleged specific facts sufficient to suggest the possibility of harassment. *See* page —— of 198 U.S.App.D.C., page 879 of 613 F.2d *infra*. It is our view, however, that a single allegation of harassment is

The record as a whole, we think, suggests that the field interviews were conducted pursuant to reasonable investigative procedures.[31] Insofar as the Commission needed a prompt verification of CTEL contributions so as to expedite La Rouche's certification decision, we cannot say that the Commission acted unreasonably during the first set of interviews in not providing the individual appellants with notice of their interviews, in approaching some of the individual appellants at their homes before they left for work in the morning, and others later in the day at their workplaces. The record, moreover, is devoid of any specific allegations of unreasonable investigative practices in connection with the second set of interviews. Thus, even on a reading of the record most favorable to appellants, we think that the Commission was not engaged in an effort to harass the USLP, CTEL, or their members, but rather in a bona fide effort to verify contributions to La Rouche's campaign in the face of possible fraud.

On the record before us, we conclude that the governmental interests served by the field interviews were sufficiently compelling to outweigh appellants' associational interests. It is significant, we think, that the record reveals that the only confrontations between appellants and the Commission arose in response to a finding of possible fraud in connection with the reported contributions to the La Rouche campaign. Although field interviews such as those that allegedly occurred here undoubtedly may discourage some political association, we cannot say here that this "chill" states a constitutional claim. Accordingly, we hold that, with regard to appellants' first amendment claim, the District Court properly granted appellees' motion for summary judgment.

## C.

Appellants' final claim is that the agents of the Commission, in gaining entry to the homes of the individual appellants and access to their financial records, conducted warrantless searches and seizures violative of the fourth amendment. Several individual appellants assert that they were interviewed "without [their] consent," and still others claim that they were "compelled" to turn over financial documents, sign statements, and disclose bank records. In response, appellees urge us to conclude that inasmuch as the record is devoid of any nonconclusory allegations that the Commission agents used force or coercion, the field interviews must be deemed to fall within the "consent" exception to the warrant requirement.

One of the well established exceptions to the fourth amendment rule that a search conducted without a warrant issued upon probable cause is *"per se* unreasonable," *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), is a search "conducted pursuant to consent." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). *Accord, Davis v. United States,* 328 U.S. 582, 66 S.Ct. 1256 90 L.Ed. 1453 (1946); *Zap v. United States,* 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946). A consent to search is, of course valid only if it "was in fact voluntarily given, and not the result of duress or coercion, express or implied." *Schneckloth v. Bustamonte, supra,* 412 U.S. at 248, 93 S.Ct. at 2059. In this regard, the Supreme Court, following its decisions under the fourteenth amendment involving the voluntariness of confessions, has held that the issue of whether a consent to search was voluntarily given is a question

insufficient to bring an entire case within the ambit of *NAACP v. Alabama.*

31. In this regard, our appellate function would surely have been aided if the Commission had promulgated rules governing the direct interviewing of contributors. It also seems especially appropriate for the Commission to adopt such rules in light of the potential chilling effect on associational rights that arises whenev-

er Commission agents descend on a community to verify individual contributions. Thus, although we do not attach decisional significance to the absence of such rules at the time the CTEL interviews were conducted, we were pleased to learn at oral argument that the Commission was then in the process of establishing guidelines for conducting field interviews.

of fact to be determined from the totality of circumstances in a particular case. *Id.* 412 U.S. 223–29, 93 S.Ct. 2041.

█ Upon examination of the affidavits filed below, we find that, except in the case of appellant Jones, the individual appellants have not alleged facts sufficient to support their claim that the field interviews were nonconsensual. The only facts alleged by the individual appellants other than Jones to explain how it was that they were coerced into being interviewed are the rather conclusory assertions of the interviewees that they felt "intimidated" by the Commission agents. A. 29, 105, 107. They do not allege, nor is there anything in the record to suggest, that the agents used force or threats to gain entry into the homes of these interviewees, to induce them to respond to the agents' questions or to compel them to sign statements or turn over financial information.

The most serious allegation other than that of appellant Jones appears in the affidavit of appellant Toppin who asserts that he was "intimidated" because the agents "were belligerent, and because throughout the interrogation the agents were continually misquoting statements [he] had previously made, and trying to get [him] to agree to their reformulation and distortion of [his] previous statements." A. 105. It is our view, however, that even appellant Toppin's allegation, when viewed as it must be in the totality of circumstances, falls short of that necessary to demonstrate that his interview was not voluntarily given, but rather was the result of duress or coercion. *See Davis v. United States,* 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946). Accordingly, we affirm that portion of the District Court's opinion dismissing the fourth amendment claims relating to the field interviews of the individual appellants other than appellant Jones.

█ We reach a different conclusion, however, with regard to appellant Jones. In his affidavit, Jones, a 59-year-old retiree due to a serious heart condition, asserts that the following exchange occurred during his interview with agent Vance: After Jones indicated that he had made contributions to CTEL, Vance asked to see the cancelled checks and inquired when they had been written. When Jones responded that he did not think he had either bit of information on hand, Vance replied in "an extremely threatening tone" that:

> If you don't give me the exact information I asked for you cpuld [*sic*] get sentenced up to 10 years in jail and be given a $10,000 fine . . . you've got a nice house here, you wouldn't want to lose it would you?

A. 30–31. Thereafter, Jones, upon searching his records for thirty minutes, turned over to Vance his tax returns and a cancelled check documenting a contribution to CTEL.

Later in the interview, Vance is said to have asked Jones to reveal the bank account numbers of Jones' personal account and that of the USLP and further "demanded" Jones to sign a statement permitting the agents to inspect his bank records. When Vance reiterated the possible sanctions if Jones refused, Jones, "in great fear," signed the statements. Throughout the interview, according to Jones, both he and his wife "felt thoroughly intimidated and in fear of loss of security and property were [they] not to comply with Mr. Vance's questions." A. 32.

It is our view that if the interview occurred as Jones has described it, Jones cannot be said to have voluntarily consented to what was otherwise a warrantless seizure of his financial documents and bank records. This conclusion follows, we think, from the case of *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), which was discussed approvingly in the Supreme Court's leading case on consent searches, *Schneckloth v. Bustamonte, supra,* 412 U.S. at 222–23, 93 S.Ct. 2041. In *Bumper,* four law enforcement officers were permitted by a 66-year-old widow to search her home after they informed her that they had a warrant but neither showed her the warrant nor read it to her. At a pretrial motion to suppress evidence discovered during the search of the widow's home,

the prosecution relied not on the validity of the warrant, but rather upon the widow's consent to the search. The trial court admitted the evidence on that basis, and its decision was affirmed by the Supreme Court of North Carolina.

The Supreme Court, however, reversed the conviction on the ground that "[w]hen a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent." 391 U.S. at 550, 88 S.Ct. at 1792.

Similarly, where, as we must assume for purposes of this appeal happened here, a Commission agent informs a contributor that if the contributor refuses to turn over financial documents, he could "get sentenced up to 10 years in jail and be given a $10,000 fine," the agent announces in effect that the contributor has no right to resist the seizure of the documents.[32] Accordingly, the situation, here, as in *Bumper,* is instinct with coercion, and where there is coercion there cannot be consent. In fact, the coercion here is even greater than in *Bumper,* for Jones was told in effect not only that he had no right to refuse, but also that, if he did refuse, he would be subject to a substantial loss of liberty and property.

For the foregoing reasons, we think that Jones has alleged facts that, if true, demonstrate that he did not consent to the warrantless seizure of his financial documents and bank records. Thus, we hold that with regard to the alleged seizure of those documents and records, the District Court erred in granting appellees' motion for summary judgment on the ground that "nothing in the record . . . supports or could support any alleged violation of plaintiffs' . . . constitutional rights."

### III

It is our view, in sum, that the District Court erred in granting summary judgment with regard to (1) appellants' statutory claim that the Commission is not empowered to inquire during field interviews into issues bearing no relation at all to the subject matter of an otherwise legitimate investigation into a candidate's eligibility to receive primary matching funds, and (2) appellant Jones' fourth amendment claim that he was subjected to a warrantless seizure of certain financial documents and bank records. In all other respects, we affirm the decision under review.

*It is so ordered.*

---

**32.** The alleged statement of agent Vance that Jones' refusal to provide the documentation Vance had requested could result in a ten-year jail sentence and a $10,000 fine apparently refers to 26 U.S.C. § 9042(c) (1976), which provides in relevant part:

(1) It is unlawful for any person knowingly and willfully—

(B) to fail to furnish to the Commission any records, books, or information requested by it for purposes of this chapter.

(2) Any person who violates the provisions of paragraph (1) shall be fined not more than $10,000, or imprisoned not more than 5 years, or both.

Although the plain language of section 9042(c) appears to suggest that Jones would have been subject to sanctions similar to those Vance allegedly mentioned, we see formidable constitutional objections to the applicability of section 9042(c) to a situation where an individual contributor who is under no reporting obligation under the Act and who has not been served with a subpoena or search warrant refuses to turn over financial documents or to provide access to his bank records. *See Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978); *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *See v. City of Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967).