**FEDERAL ELECTION COMMISSION,**
Appellee,

v.

**COMMITTEE TO ELECT LYNDON LA ROUCHE et al., Appellants.**

No. 77–1987.

United States Court of Appeals,
District of Columbia Circuit.
Argued Sept. 27, 1978.
Decided Aug. 23, 1979.
Certiorari Denied Feb. 19, 1980.
See 100 S.Ct. 1019.

David S. Heller, New York City, a member of the bar of the Supreme Court of Wisconsin, *pro hac vice*, by special leave of the court, with whom Joel D. Joseph, Washington, D. C., was on the brief, for appellants.

Charles N. Steele, Associate Gen. Counsel, and Barbara Van Gelder, Atty., Federal Election Commission, Washington, D. C., with whom William C. Oldaker, Gen. Counsel, Lester N. Scall, Asst. Gen. Counsel, Federal Election Commission, Washington, D. C., were on the brief, for appellee.

Paul D. Kamenar, Washington, D. C., entered an appearance for appellants.

Before McGOWAN and TAMM, Circuit Judges, and JUNE L. GREEN,* District Judge.

Opinion for the court filed by Circuit Judge McGOWAN.

McGOWAN, Circuit Judge:

This is an appeal from an order of the District Court enforcing subpoenas issued by the Federal Election Commission (Commission) during an investigation into possible violations of the federal election laws in connection with the campaign of Lyndon La Rouche for the 1976 Presidential nomination of the United States Labor Party (USLP).[1] Appellants, the Committee to

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. This appeal was consolidated for purposes of oral argument with *Committee to Elect Lyndon*

*La Rouche v. Federal Election Commission*, 198 U.S.App.D.C. ——, 613 F.2d 834, and *Jones v. Federal Election Commission*. 198 U.S.App. D.C. ——, 613 F.2d 864, both decided this date.

Elect Lyndon La Rouche (CTEL), the National Caucus of Labor Committees (NCLC), the New Solidarity International Press Service, Inc. (New Solidarity), and Campaigner Publications, Inc. (Campaigner), challenge the decision under review on the grounds that the District Court lacked subject matter jurisdiction to entertain the suit, that appellants were not subject to extraterritorial service of process, and that the District Court erred in not permitting appellants to demonstrate that the subpoenas were issued for an improper purpose. For reasons hereinafter appearing, we affirm the decision under review.

## I

The events culminating in the issuance of the Commission's subpoenas began on October 14, 1976, when Lyndon La Rouche applied to the Commission for primary matching funds under the Presidential Primary Matching Payment Account Act, 26 U.S.C. §§ 9031–9042 (1976). To qualify for such funds, a candidate must certify, *inter alia,* that he has received in excess of $5,000 in contributions of $250 or less in each of at least 20 states. *Id.* § 9033(b)(3)–(4). In support of his application, La Rouche submitted a notarized statement that he had raised the threshold amount. But neither LaRouche nor CTEL, his principal campaign committee, provided appropriate documentation of the contributions.

On November 4, 1976, the Commission authorized its staff to conduct a field audit in order to verify La Rouche's eligibility for matching funds. That audit, which took place shortly thereafter at CTEL's headquarters in New York City, uncovered many instances where contributions made by money order or cashier's check raised substantial questions as to whether the contributions were made by residents of the states indicated. In addition to these irregularities, the audit revealed a pattern of heavy last-minute contributions from persons listing their occupation as that of "volunteer coordinator" for NCLC, an organization that, during the last two weeks of the eligibility period, received payments from

CTEL of more than $310,000. It further indicated that CTEL shared office space and common personnel with NCLC and three other organizations (New Solidarity, Campaigner, and the USLP) and that those organizations accounted for 78% of CTEL's expenditures and 97% of its debt. These findings seemed particularly significant in light of the fact that CTEL had surpassed the $5,000 threshold by only a narrow margin in at least several states.

In response to these findings, the Commission both expanded the audit to include the four organizations closely related to CTEL and authorized the Commission staff to interview CTEL contributors in order to verify their contributions. During the week of January 26, 1977, agents of the Commission either did, or attempted to, interview listed contributors in three states, Delaware, Massachusetts, and Wisconsin. The results of the field interviews revealed that in neither Delaware nor Wisconsin had La Rouche raised the threshold amount. Accordingly, on February 10, 1977, the Commission rejected La Rouche's application for matching funds. We today affirm that decision in No. 77–1184. *Committee to Elect Lyndon La Rouche v. Federal Election Commission,* 198 U.S.App.D.C. ——, 613 F.2d 834 (D.C.Cir. 1979).

On April 28, 1977, the USLP, CTEL, and ten individuals who contributed to CTEL in 1976 filed suit in the District Court, seeking damages and injunctive relief against the Commission and various members of its staff. The principal allegations were that the field interviews of CTEL contributors were unauthorized by statute and violative of the first and fourth amendments. On October 25, 1977, the District Court granted defendants' motion for summary judgment, concluding that "nothing in the record . . . supports or . . . could support any alleged violation of Plaintiffs' . . . statutory or constitutional rights." In No. 77–2093, we today affirm that decision in part, and reverse in part. *Jones v. Unknown Agents of the Federal Election Commission,* 198 U.S.App.D.C. ——, 613 F.2d 864 (D.C.Cir. 1979).

While the *Jones* case was pending in the District Court, the Commission, upon reviewing both the results of the inquiry into La Rouche's eligibility for matching funds and various reports of contributions and expenditures required to be filed with the Commission pursuant to 2 U.S.C. § 434, determined that there was reason to believe that the USLP, CTEL, NCLC, New Solidarity, and Campaigner (the five organizations) had violated certain provisions of the federal elections laws. By letters dated May 13, 1977, the Commission notified each of the five organizations that they were under investigation and, in each case, detailed the nature of the suspected statutory violations. Thus, the letter to NCLC indicated that there was reason to believe that NCLC was a political committee and, as such, had violated 2 U.S.C. sections 433 and 434 by failing to register and file reports with the Commission; that there was reason to believe that NCLC had violated 2 U.S.C. section 441a by making excessive in-kind contributions to CTEL and the USLP; and that there was reason to believe that NCLC had violated 2 U.S.C. section 433(b)(2) by not registering as an affiliated committee with CTEL and the USLP.

The letters to New Solidarity and Campaigner notified them that they might be in violation of 2 U.S.C. section 441b(a) for making illegal in-kind corporate contributions to CTEL and the USLP by extending to those organizations long-term credit on behalf of the La Rouche campaign. The Commission notified the USLP that there was reason to believe that, in contravention of 2 U.S.C. section 433(b)(2), it had failed to report its affiliation with CTEL and NCLC. Finally, the Commission notified CTEL that not only had it failed to report its apparent affiliation with NCLC and the USLP, but also that there was reason to believe that CTEL had made false or misleading statements in its submissions for matching funds.[2]

On June 9, 1977, the Commission, having yet to receive a response to its letters of May 13, sent follow-up letters to the five organizations. By letters of June 11, 1977, and June 13, 1977, local Washington counsel notified the Commission that they had been retained to represent the five organizations. In addition to seeking further information about the charges, counsel requested the Commission to stay its investigation until the District Court decided the *Jones* case. This request was denied.

On June 24, 1977, the Commission, in furtherance of its investigation, subpoenaed the five organizations to produce at their New York offices on July 8, 1977, specified documents pertaining to their expenditures, contributions, and lease and loan agreements.[3] On July 1, 1977, the Commission received a request from local Washington counsel asking for additional time in which to secure counsel in New York and to assemble the documents for Commission review. This request was denied; however, the Commission staff offered to reschedule the return date.

On July 8, 1977, when the Commission staff went to New York to examine the subpoenaed documents, representatives of the five organizations and newly retained New York counsel indicated that the materials were not yet assembled. Counsel for the Commission nonetheless used the occasion to review each subpoena and the attachments thereto with the representatives of the organizations and New York counsel. At the July 8 meeting, New York counsel stipulated to produce the documents on July 20, 1977; counsel for the Commission agreed to return to New York to review the documents on that date. On July 19, 1977, however, New York counsel notified the Commission that the five organizations would not comply with the subpoenas.

---

2. This letter also notified CTEL that the Commission was consolidating its earlier cases into this matter.

3. The Commission issued the subpoenas pursuant to its authority "to require by subpena, signed by the chairman or the vice chairman, the attendance and testimony of witnesses and the production of all documentary evidence relating to the execution of its duties." 2 U.S.C. § 437d(a)(3) (1976).

On August 23, 1977, the Commission petitioned the District Court below for enforcement of the subpoenas pursuant to 2 U.S.C. section 437d(b), which authorizes any United States district court "within the jurisdiction of which any inquiry is carried on" to order compliance with a Commission subpoena. That same day, the District Court issued a show cause order requiring the five organizations to appear on September 8, 1977, to demonstrate why the subpoenas should not be enforced. The District Court further directed that the show cause order be served on the organizations by the United States Marshal in New York. Copies of the petition, exhibits, and memoranda also were mailed to the organizations' New York counsel and hand delivered to local Washington counsel.

On September 7, 1977, local Washington counsel filed a motion to dismiss the petition on the ground (1) that, inasmuch as New York, not the District of Columbia, was the situs of the Commission's inquiry, the District Court lacked subject matter jurisdiction to entertain the suit under 2 U.S.C. § 437d(b), (2) that the United States Marshal in New York had not effected service of the show cause order upon either CTEL or the USLP, and (3) that the remaining three organizations, having been served only earlier that day, lacked adequate time to prepare a defense. At the show cause hearing held on September 8, 1977, local counsel also urged the District Court not to enforce the subpoenas for several additional reasons, including the allegation that the subpoenas were issued for the improper purpose of harassment and retaliation for the two pending law suits filed by CTEL and the USLP against the Commission. At the conclusion of his argument, local counsel requested leave to file a "written statement" within 10 days. The District Court, however, after hearing rebuttal

argument, rejected counsel's request, indicating that it would probably rule on the papers.

On September 26, 1977, the District Court issued a Memorandum Order concluding that it had subject matter jurisdiction over the petition because the Commission's inquiry was properly viewed as being carried on in the District of Columbia. The District Court also held that, except for the USLP, all the organizations had been properly served, and had been afforded adequate time to prepare their defense. It further rejected the claim that the subpoenas were issued for the purpose of harassment or retaliation. Accordingly, the District Court ordered CTEL, NCLC, New Solidarity, and Campaigner to comply with the Commission's subpoenas.

On September 28, 1977, those organizations filed this appeal and later applied for a stay pending appeal. This court, on November 8, 1977, denied appellants' motion for a stay.

II

We are urged to reverse the District Court on three grounds.[4] Two of the grounds relate to the jurisdictional provision for the enforcement of Commission subpoenas, 2 U.S.C. § 437d(b), which provides:

Any United States district court within the jurisdiction of which any inquiry is carried on, may, upon petition by the Commission, in case of refusal to obey a subpena or order of the Commission issued under subsection (a) of this section, issue an order requiring compliance therewith. Any failure to obey the order of the court may be punished by the court as a contempt thereof.

4. We find no merit in appellants' fourth ground for reversal, namely, that the enforcement of the Commission's subpoenas was "premature" insofar as the Commission failed to discharge its obligation to afford appellants "a reasonable opportunity to demonstrate that no action should be taken against [them]," 2 U.S.C. § 437g(a)(4) (1976). It is our view that appellants were afforded a more than adequate opportunity to demonstrate their compliance with the federal election laws when, on July 8, 1977, counsel for the Commission, who had been sent to New York to examine the subpoenaed documents, reviewed the subpoenas and the attachments thereto with appellants and their New York counsel.

First, appellants renew their argument that the District Court lacked subject matter jurisdiction to entertain this enforcement petition, because, within the meaning of section 437d(b), the Commission's "inquiry [was] carried on" in New York rather than in the District of Columbia. Second, urging us to construe section 437d(b) as not authorizing extraterritorial service of process, appellants assert that, inasmuch as they were served in New York, the District Court lacked personal jurisdiction to enforce the subpoenas. Third, in a claim unrelated to section 437d(b), appellants argue that the District Court erred in not providing them with at least some opportunity to substantiate their allegations that the subpoenas were issued for an improper purpose. We turn now to these arguments.

### A.

■ Appellants assert that, within the meaning of section 437d(b), the District of Columbia was not a place where the Commission's "inquiry [was] carried on" and that, accordingly, the District Court lacked subject matter jurisdiction to entertain this suit. It is appellants' view that inasmuch as the documents at issue were located in New York, the subpoenas were made returnable in New York, appellants maintain their principal places of business in New York, and prior Commission audits took place in New York, the District Court erred in concluding that the District of Columbia was a situs of the Commission's inquiry.

It appears that we are the first court, other than the District Court, to be called upon to determine where a Commission "inquiry [was] carried on" for purposes of establishing jurisdiction to enforce a subpoena under section 437d(b). But, as the District Court correctly noted, we do not write on an entirely clean slate. Both section 9 of the Federal Trade Commission Act, 15 U.S.C. § 49 (1976), and section 112(c)(4) of the National Traffic and Motor Vehicle Safety Act, 15 U.S.C. § 1401(c)(4) (1976), are virtually identical to section 437d(b), providing as they do for the enforcement of subpoenas in any "United States district court within the jurisdiction of which [the agency's] inquiry is carried on."[5] Several courts have construed these provisions, and we look now to their decisions.

The leading case in this regard is *FTC v. MacArthur*, 532 F.2d 1135 (7th Cir. 1976). There the FTC was conducting an investigation to determine whether Bankers Life and Casualty Company had engaged in unfair and deceptive acts or practice in connection with the sale of land in Colorado. The FTC, as part of the investigation, subpoenaed Bankers' president to produce specified documents and to testify at an investigative hearing at the FTC's regional office in Chicago. When the FTC later sought judicial enforcement of the subpoena in Chicago, Bankers' president resisted on the ground that many of the subpoenaed documents were located in Florida and that, in any event, no inquiry was being carried on in Chicago because other FTC regional offices also were involved in the investigation. The district court apparently rejected this argument at least with regard to the docu-

---

5. These provisions are not precisely identical to section 437d(b). Section 9 authorizes the enforcement of an FTC subpoena in any United States district court "within the jurisdiction of which *such* inquiry is carried on" (emphasis added), referring to the express power of the FTC to require the "attendance of witnesses, and the production of such documentary evidence, . . . from any place in the United States, at any designated place of hearing." 15 U.S.C. § 49 (1976). Section 112(c)(4) provides for the enforcement of a subpoena of the National Highway Traffic Safety Administration in any United States district court "within the jurisdiction of which *an* inquiry is carried on." 15 U.S.C. § 1401(c)(4) (1976) (emphasis added).

Finally, section 437d(b) authorizes the enforcement of a Commission subpoena in any United States district court "within the jurisdiction of which *any* inquiry is carried on." 2 U.S.C. § 437d(b) (1976) (emphasis added).

These minor differences in phrasing, however, are not, we think, significant enough to cause us to depart from the case law interpreting section 9 and section 112(c)(4) in our task of determining where, within the meaning of section 437d(b), the Commission's "inquiry [was] carried on." *See United States v. Firestone Tire & Rubber Co.*, 455 F.Supp. 1072 (D.D.C.1978) (applying the section 9 case law to interpret section 112(c)(4)).

ments located within its jurisdictional limits.

When the argument was renewed on appeal, the Seventh Circuit outlined the following test:

*The test whether the Commission is undertaking an inquiry in a particular place is whether that place and the activities occurring there bear a reasonable relation to the subject matter of the investigation.* Factors such as the convenience of the Commission, the location of documents and witnesses, and the corporate headquarters of the company are relevant in determining whether there is an inquiry in a particular judicial district when the only action taken by the Commission is a request for information. *As in other areas, the Commission's choice of a place of inquiry is subject to the bound of reasonableness.*

*Id.* at 1140 (emphasis added). Applying this test, the court concluded that inasmuch as Bankers had its corporate headquarters in Chicago, many of the documents presumably were located in Chicago, and the FTC had selected Chicago as the place to conduct its investigational hearing, sufficient inquiry was being carried on in that district to confer jurisdiction to enforce the subpoenas. *Id.* at 1140–41.

With regard to the fact that some documents may have been located in Florida, the court recognized that where an investigation involves matters in more than one jurisdiction, there necessarily may not be a single district in which the inquiry is being carried on, but rather many such districts. It also expressed the view that, subject to the "bound of reasonableness," an agency should be given substantial leeway in selecting its place of inquiry for subpoena enforcement purposes. The court in *MacArthur* concluded that, on the facts there presented, the FTC had not exceeded that "bound" in selecting Chicago as its place of inquiry. *Id.*

Three cases decided in this jurisdiction, each involving an essentially nationwide investigation conducted from an agency's national office here in the District of Columbia, reveal that the "bound of reasonableness" is broad indeed. Two of these cases arose in the context of adjudicative proceedings before the FTC. In *FTC v. Browning,* 140 U.S.App.D.C. 292, 435 F.2d 96 (D.C.Cir. 1970), where a corporation was under investigation for possible antitrust violations with regard to its acquisition of five firms in three states, the FTC subpoenaed an officer of the corporation requiring him to produce specified corporate books and records at a hearing in the District of Columbia. When he failed to comply, the FTC brought suit to enforce the subpoena in the District of Columbia even though the corporate officer maintained his residence and principal place of business in Pennsylvania.[6] The district court issued an enforcement order. On appeal, this court, noting that the subpoena against the corporate officer had been issued, and was returnable, in the District of Columbia, concluded that "the designated place of hearing is Washington, D. C., which is thus necessarily a place where the 'inquiry is carried on.'" *Id.* at 296 & n.8, 435 F.2d at 100 & n.8.

The second case arising in the context of an FTC hearing was *FTC v. Cockrell,* 431 F.Supp. 558 (D.D.C.1977). There the FTC had charged three parties, including the American Medical Association, with violating section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 (1976), by agreeing to prevent or hinder competition among physicians by means of publishing, circulating, and enforcing nationwide "ethical standards." As part of an adjudicative proceeding being conducted in the District of Columbia, an FTC administrative law judge issued subpoenas to respondents, a Texas medical society and its executive director, as well as to other third-party witnesses across the country. These subpoenas, which were made returnable in the District of

---

**6.** In connection with the same investigation, the FTC was also seeking to enforce thirteen subpoenas against third-party witnesses located in seven different judicial districts. 140 U.S. App.D.C. at 296, 435 F.2d at 100.

Columbia, sought information regarding ethical standards imposed on physicians and the interpretation, application, and enforcement of those standards.

When the FTC petitioned for judicial enforcement of the subpoenas in this jurisdiction, respondents objected on the ground that the activities under investigation bore no reasonable relationship to the District of Columbia and that, accordingly, this was not a jurisdiction within which the FTC's inquiry was being carried on. The district court rejected this argument:

> Respondents, however, misconstrue the nature of the FTC's inquiry in the present case. The FTC inquiry here is not focused on respondents and their activities in Texas; rather, it is a *nationwide* inquiry and respondents are being subpoenaed merely as third-party witnesses. As such, it is clear that the Commission's choice of the District of Columbia as the place for its inquiry does not exceed "the bound of reasonableness."

431 F.Supp. at 559 (emphasis in original) (quoting *FTC v. MacArthur, supra,* 532 F.2d at 1140). Reasoning that the case was controlled by *Browning,* the district court concluded that it had jurisdiction to enforce the subpoenas.

A similar result was reached in *United States v. Firestone Tire & Rubber Co.,* 455 F.Supp. 1072 (D.D.C.1978), a case involving not a formal adjudicative proceeding before the FTC, but rather an informal investigation by the National Highway Traffic Safety Administration (NHTSA). In *Firestone Tire,* NHTSA brought suit in the District of Columbia to enforce "special orders," akin to administrative subpoenas, issued to Firestone in connection with an investigation into alleged defects in Firestone's steel-belted radial tires. The special orders, which were issued from the District of Columbia, sought information regarding the different types and quantities of tires produced and distributed by Firestone, consumer complaints about those tires, and suits against Firestone for damages due to accidents allegedly caused by tire defects. When NHTSA sued for enforcement in this juris-

diction under section 112(c)(4) of the National Traffic and Motor Vehicle Safety Act, Firestone urged the district court to conclude that it lacked jurisdiction because NHTSA's "inquiry [was being] carried on" not in the District of Columbia, but rather in Ohio where Firestone maintained its corporate headquarters and the requested information was located.

It was the view of the district court, however, that a finding of no jurisdiction in the District of Columbia would be contrary both to "common sense" and NHTSA's broad investigative mandate to ensure highway traffic safety. The district court further observed:

> NHTSA's concern is not with the activities of Firestone within the Northern District of Ohio, but with the safety of all Firestone tires in the country. As such, given the broad nature of NHTSA's concern in this case, this would appear to qualify as a nationwide inquiry within the meaning of *FTC v. Cockrell, supra.* Therefore, since this investigation is directed from Washington, D. C., it does not exceed the bounds of reasonableness to find that the District of Columbia is a place within which this inquiry is being carried on.

*Id.* at 1077. Thus, although recognizing that Ohio might also be said to be a situs of the inquiry, the district court concluded that, for jurisdictional purposes, the District of Columbia was a place where NHTSA's inquiry was being carried on. Accordingly, as in the *Browning* and *Cockrell* cases, the court in *Firestone Tire,* confronted with a situation where an agency was conducting an essentially nationwide investigation from its national office in the District of Columbia, accorded the agency broad discretion in selecting the District of Columbia as its place of inquiry.

The case law interpreting section 9 and section 112(c)(4) is, we think, an appropriate guide in our task of determining where the Commission's "inquiry [was] carried on" within the meaning of section 437d(b). Accordingly, we must determine (1) whether the District of Columbia bore a sufficiently

"reasonable relation to the subject matter of the investigation," *FTC v. MacArthur, supra,* 532 F.2d at 1140, to qualify as a place where the inquiry was carried on, and (2) whether the agency's choice of this jurisdiction as its place of inquiry exceeded "the bound of reasonableness," *id.*

It is our view that the District of Columbia was a place where the Commission's inquiry was carried on. The nexus between this jurisdiction and the Commission's investigation lies in the fact that the District of Columbia, where the Commission maintains its headquarters, was the hub of the Commission's investigative activity. It was in this jurisdiction where the Commission authorized the auditing of CTEL's records and the interviewing of its contributors, where the Commission determined that there was reason to believe that appellants may have violated the federal election laws, where all correspondence regarding those possible violations emanated, and where the subpoenas were in fact issued.[7] We also regard it as significant, though not surprising, that appellants, when first notified by letter that they were under investigation, retained local counsel in the District of Columbia. That appellants retained local counsel before hiring New York counsel, and long before this enforcement petition was filed, strongly suggests that appellants themselves recognized that the District of Columbia was the important situs of the investigation. We have little difficulty, therefore, in concluding that, within the meaning of section 437d(b), the District of Columbia was a place where the Commission's "inquiry [was] carried on."

Nor do we regard the Commission's choice of the District of Columbia as its place of inquiry as having exceeded the "bound of reasonableness." Appellants urge us to construe that "bound" more narrowly under section 437d(b) than under section 9 or section 112(c)(4) because the Commission's investigative mandate, involving as it does electoral activity, touches upon constitutionally protected rights of freedom of association. In particular, appellants argue that a substantial chilling effect would result if the Commission, as part of a nationwide investigation, could enforce in the District of Columbia subpoenas issued to individual contributors to a minor party across the United States.

It is our view that appellants are correct in suggesting that the chilling effect of the Commission's choice of its place of inquiry ought to be considered in determining whether the choice falls within the "bound of reasonableness." In the instant case, however, which of course does not involve subpoenas issued to individual contributors, the record is devoid of any evidence of chill resulting from the fact that the subpoenas were enforced in the District of Columbia.

What the record does reveal is that the Commission's investigation was not localized in New York, but rather was nationwide in scope.[8] When La Rouche applied for primary matching funds, he submitted a notarized statement that he had raised the threshold amount of $5,000 or more in contributions of $250 or less in each of 20 states. In an effort to verify La Rouche's statement, the Commission conducted field interviews of CTEL contributors in three states, Delaware, Massachusetts, and Wis-

---

**7.** It is true that the subpoenas were returnable in New York, but this was done solely for the convenience of appellants. A. 9–10. The Commission intended to send its staff from Washington to New York to examine the documents. The same procedure had been followed when the Commission conducted its audit of CTEL's records in connection with La Rouche's application for primary matching funds.

**8.** Thus, appellant's reliance on *FTC v. Western General Dairies, Inc.,* 432 F.Supp. 31 (N.D.Cal. 1977), is misplaced. In *Western General,* which involved an investigation into possible

unfair trade practices in the distribution of milk in Utah and Idaho, the court rejected the argument that simply because a subpoena had been issued from the FTC's regional office in the Northern District of California, the FTC's inquiry was being carried on in that district. But, in so ruling, the court relied principally on the fact that the investigation was neither nationwide in scope nor related in any manner to the Northern District of California. *Id.* at 33–34. It is our view that, inasmuch as the instant case involves a nationwide investigation, *Western General* is inapposite.

consin. When those interviews, together with an audit of CTEL's records in New York, yielded discrepancies with reported contributions, the Commission conducted additional field interviews in Indiana. Moreover, when the Commission finally subpoenaed appellants' records, it was investigating to determine whether appellants had made illegal in-kind corporate contributions, submitted false and misleading statements, and committed other violations of the federal election laws in connection with the *national* campaign of a candidate who had been endorsed by the USLP Caucus in 30 states and the District of Columbia.

It is our view that here, as in *Browning, Cockrell,* and *Firestone Tire,* the Commission was conducting an essentially nationwide investigation from its national office in the District of Columbia and, accordingly, it should be afforded broad discretion in selecting this jurisdiction as its place of inquiry. We cannot say, given the breadth of that discretion and the absence of any evidence of chill, that the Commission exceeded the "bound of reasonableness" in bringing this enforcement action in the District of Columbia. Accordingly, we conclude that the District Court had subject matter jurisdiction under section 437d(b) to entertain this subpoena enforcement action.[9]

## B.

■ We turn now to the argument that the District Court lacked personal jurisdiction over appellants inasmuch as they were served not in the District of Columbia where the District Court sits, but rather in New York where appellants maintain their principal places of business. Service of process outside the territorial limits of the state in which a district court sits normally is permitted only "when authorized by a statute of the United States."[10] The issue we must decide, therefore, is whether section 437d(b) is a statute authorizing extraterritorial service of process.

Although confronted with a question of first impression, we find, once again, that the same question has been resolved in a case involving a subpoena enforcement action brought under section 9 of the Federal Trade Commission Act.[11] In *FTC v.*

---

**9.** To say that the Commission's inquiry was being carried on in the District of Columbia is not to say that it was not also being carried on in New York. *See FTC v. MacArthur, supra,* 532 F.2d at 1141. Certainly, given the facts that the subpoenaed documents were located in New York, appellants maintain their principal places of business in New York, the subpoenas were made returnable in New York, and prior Commission auditing took place in New York, the Commission probably could have brought this action to enforce its subpoenas in that district. But the Commission chose not to do so, and we honor its choice. It is our view that, for the reasons stated above, the Commission's choice of Washington as its place of inquiry, did not exceed the "bound of reasonableness."

**10.** Fed.R.Civ.P. 4(f).

**11.** Section 9 provides in relevant part:
For the purposes of sections 41 to 46 and 47 to 58 of this title the Commission, or its duly authorized agent or agents, shall at all reasonable times have access to, for the purpose of examination, and the right to copy any documentary evidence of any person, partnership, or corporation being investigated or proceeded against; and the Commission shall have power to require by subpoena the attendance and testimony of witnesses and the production of all such documentary evidence relating to any matter under investigation. Any member of the Commission may sign subpoenas, and members and examiners of the Commission may administer oaths and affirmations, examine witnesses, and receive evidence.

Such attendance of witnesses, and the production of such documentary evidence, may be required from any place in the United States, at any designated place of hearing. And in case of disobedience to a subpoena the Commission may invoke the aid of any court of the United States in requiring the attendance and testimony of witnesses and the production of documentary evidence.

Any of the district courts of the United States within the jurisdiction of which such inquiry is carried on may, in case of contumacy or refusal to obey a subpoena issued to any person, partnership, or corporation issue an order requiring such person, partnership, or corporation [to] appear before the Commission, or to produce documentary evidence if so ordered, or to give evidence touching the matter in question; and any failure to obey such order of the court may be punished by such court as a contempt thereof.

*Browning,* 140 U.S.App.D.C. 292, 435 F.2d 96 (D.C.Cir. 1970), appellant resisted the enforcement of a subpoena on the ground that he was served by mail outside the District of Columbia where the suit was filed. Appellant argued that section 9, which provides for the enforcement of an FTC subpoena in any United States district court "within the jurisdiction of which such inquiry is carried on," ought to be construed simply as a venue provision, rather than as a special jurisdictional provision authorizing extraterritorial service of process.

This court in *Browning* rejected appellants' argument:

> To interpret Section 9 as simply a venue statute would be to restrict the place of suit to a particular district and yet to deprive the court in that district of the power to obtain personal jurisdiction of a respondent, absent the fortuitous circumstance of that respondent voluntarily entering the district where the inquiry is being conducted.

*Id.* at 295, 435 F.2d at 99. Such a construction, we noted, would run counter to the FTC's broad investigative powers and its express authority under section 9 to compel "attendance and testimony of witnesses and the production of . . . documentary evidence relating to any matter under investigation . . . from any place in the United States, at any designated place of hearing." We also observed that extraterritorial service of process would make "for uniformity in the application of the law and economy of judicial administration" by permitting an agency to center its enforcement proceedings in a single court. *Id.* at 296, 435 F.2d at 100. Accordingly, we concluded that "by granting the power to enforce subpoenas only to those district courts 'within the jurisdiction of which such inquiry is carried on,' Section 9 so limits the place of suit for enforcement of Federal Trade Commission subpoenas as to require an implied grant of authority for extra-territorial service of process in order to effectuate the purpose of the regulatory scheme." *Id.* at 296, 435 F.2d 100 (footnote omitted).

Section 437d(b) is, as we noted above, virtually identical to section 9, insofar as it grants the Commission authority to enforce its subpoenas only in those United States district courts "within the jurisdiction of which any inquiry is carried on." [12] Thus, at least at first blush, it appears that the reasoning of the *Browning* decision would be equally applicable in the instant case. Appellants, however, urge us, on three grounds, to depart from *Browning* in determining whether section 437d(b) is an implied grant of authority for extraterritorial service of process.[13]

Appellants first argue that the Commission, unlike the FTC, is not charged by statute with regulatory responsibility over matters requiring nationwide investigations. While describing "FTC investigations [as] often aimed at industrywide practices, which cover regional or possibly national areas, beyond a single person or company," appellants assert that "the FEC regulates individual candidates and their campaign committees, which are clearly limited to one locality." We are urged, therefore,

___

15 U.S.C. § 49 (1976).

**12.** 2 U.S.C. § 437d(b) (1976). We attach no decisional significance to the fact that section 9 refers to "the jurisdiction of which *such* inquiry is carried on," whereas section 437d(b) refers to "the jurisdiction of which *any* inquiry is carried on." *See* note 5 *supra.* As we explain below, the Commission is vested with an implicit grant of extraterritorial compulsory process broad enough to permit the Commission to conduct an inquiry comparable to that contemplated under section 9 by the FTC. *See* pages —————— of 198 U.S.App.D.C., pages 860–862 of 613 F.2d *infra.* Accordingly, we see nothing on the face of the two provisions that would suggest that they should be interpreted

differently at least insofar as extraterritorial service of process is concerned.

**13.** Appellants also advance a fourth ground for distinguishing *Browning,* namely, that the legislative history of section 9 supported a finding of an implied grant of authority for extraterritorial service of process, whereas the legislative history of section 437d(b) is silent in this regard. This argument, we think, overstates this court's reliance in *Browning* on the legislative history of section 9, for the *Browning* court itself recognized that the legislative history was "not conclusive." 140 U.S.App.D.C. at 296, 435 F.2d at 100.

to conclude that, given the localized nature of Commission investigations, it is unnecessary to construe section 437d(b) as authorizing extraterritorial service of process.

This argument, we think, falls far short of the mark. The Commission's investigative responsibilities with regard to primary matching funds are obviously nationwide in scope. A prerequisite for eligibility for matching funds.is a minimum level of financial support for a candidate in at least 20 states. 26 U.S.C. § 9033(b)(3)–(4) (1976). Review of determinations in matching fund cases is centralized by statute in this court. *Id.* § 9041. Moreover, the Commission's general responsibilities under the Federal Election Campaign Act also clearly make it responsible for administering the federal election laws with regard to many organizations not local in nature, such as corporations and unions, 2 U.S.C. § 441b (1976), multicandidate committees and national parties, *id.* § 441a(a), and government contractors, *id.* § 441c. Appellants thus are simply wrong when they state "the FTC regulates individual candidates and their campaign committees, which are *clearly limited to one locality*" (emphasis added). Many of the Commission's responsibilities involve nationwide matters, in particular Presidential campaigns, especially those seeking federal funds. It is our view, therefore, that the instant case is in no way distinguishable from *Browning* on grounds related to the scope of the Commission's investigative mandate.

Nor do we find merit in appellants' second ground for distinguishing *Browning,* namely, that the Commission, unlike the FTC, is not expressly authorized to compel "attendance and testimony of witnesses and the production of . . . documentary evidence relating to any matter under investigation . . . from any place in the United States, at any designated place of hearing." [14] Although the Commission is not expressly granted extraterritorial power of compulsory process, we find such authority implicit in the breadth of the Commission's express investigative powers.

Section 437d(a) of the Federal Election Campaign Act vests the Commission with the power:

(1) to require, by special or general orders, any person to submit in writing such reports and answers to questions as the Commission may prescribe; and such submission shall be made within such a reasonable period of time and under oath or otherwise as the Commission may determine;

.    .    .    .    .

(3) to require by subpena, signed by the chairman or the vice chairman, the attendance and testimony of witnesses and the production of all documentary evidence relating to the execution of its duties;

(4) in any proceeding or investigation, to order testimony to be taken by deposition before any person who is designated by the Commission and has the power to administer oaths and, in such instances, to compel testimony and the production of evidence in the same manner as authorized under paragraph (3) of this subsection; [15]

It is inconceivable to us that Congress would have vested the Commission with such broad powers of compulsory process, while intending that they not have extraterritorial effect. The Commission, if denied the power of extraterritorial compulsory process, would be unable to conduct a nationwide investigation without sitting, or sending its staff, to every jurisdiction in which witnesses or documents were located. To so fragment an investigation undoubtedly would frustrate the Commission in discharging what we have already determined is its nationwide mandate to oversee the federal election laws. Thus, although we need not, and do not, decide the precise extent to which the Commission may compel testimony and the production of documents from anywhere in the United States, we are convinced that the scope of the

---

**14.** 45 U.S.C. § 49 (1976).

**15.** 2 U.S.C. § 437d(a)(1), (3), (4) (1976).

Commission's power in this regard is sufficiently broad to warrant an implied grant of authority for extraterritorial service of process under section 437d(b).[16]

Appellants' third, and final, ground for distinguishing *Browning* is that extraterritorial service of process in the instant case, unlike that in *Browning,* would result in a substantial chilling effect on the exercise of constitutionally protected associational rights. It is asserted that a substantial chilling effect on associational rights undoubtedly would result in cases involving minor parties if individual contributors were subject to such long-distance service of process. We are urged, therefore, not to permit extraterritorial service of process under section 437d(b).

This "chilling effect" argument is, on the record of this case, simply too speculative to warrant us to construe section 437d(b) in a manner that we feel would frustrate the Commission in discharging its statutory mandate. The record before us is devoid of any evidence to suggest that, in the instant case, a chilling effect resulted from the fact that the Commission initiated this suit in the District of Columbia through extraterritorial service of process of appellants in New York.[17] Nor is there any evidence supporting the assertion that if we construe section 437d(b) as authorizing extraterritorial service of process, our holding will result in a significant encroachment on associational rights in future cases. This assertion, in our view, fails to recognize that the Commission's choice of its forum to enforce a subpoena is subject to the "bound of reasonableness."[18] We are confident that, especially in cases involving investigations of minor parties, district courts in determining whether the Commission's choice of forum falls within the "bound of reasonableness" will give appropriate consideration to the chilling effect of permitting the Commission to enforce its subpoenas outside the jurisdiction in which the subpoenaed parties reside or maintain their principal places of business. That protection, we think, is sufficient to safeguard against undue chill in future cases.

---

**16.** This conclusion finds support in *United States v. Firestone Tire & Rubber Co., supra,* 455 F.Supp. at 1078–80, a suit to enforce "special orders," akin to administrative subpoenas, filed in the District of Columbia by the National Highway Traffic Safety Administration (NHTSA) under Section 112(c)(4) of the National Traffic and Motor Vehicle Safety Act, 15 U.S.C. § 1401(c)(4) (1976). Respondent, which had been served by mail at its corporate headquarters in Ohio, argued that section 112(c)(4) was not an implied grant of authority for extraterritorial service of process and that, accordingly, the district court lacked personal jurisdiction to enforce the special orders. Although recognizing that section 112(c)(4), like section 9 of the Federal Trade Commission Act, authorized the enforcement of an NHTSA special order in any United States district court "within the jurisdiction of which an inquiry is carried on," respondent sought to distinguish *Browning* on the ground that the Federal Trade Commission Act expressly authorized the FTC to issue subpoenas nationwide, whereas section 112(c)(4) contained no such grant of authority. The court in *Firestone,* however, found such authority implicit in NHTSA's enabling statute. To deny NHTSA the power to issue special orders anywhere in the United States, the court reasoned, would be inconsistent with the broad enforcement jurisdiction conferred on the federal district courts under section 112(c)(4) and the wide-ranging investigative powers conferred on NHTSA to discharge its national mandate of ensuring highway traffic safety. Having determined that NHTSA had an implied grant of authority to issue special orders nationwide comparable to that in the Federal Trade Commission Act, the court concluded, on the authority of *Browning,* that section 112(c)(4), like section 9, was an implied grant of authority for extraterritorial service of process.

**17.** Appellants' only specific complaint is that the fact that the Commission made the subpoenas returnable in New York, but later sought enforcement in the District of Columbia, "forced [appellants] to obtain at least two sets of lawyers in these respective locations, . . . and resulted in great harm to [appellants] because of their limited ability to retain adequate legal resources necessary in an action involving a federal agency with relatively unlimited resources." The record indicates, however, that the Commission made the subpoenas returnable in New York for appellants' convenience, A. 9–10, and that, in any event, appellants had retained local counsel in Washington well before this suit was filed, A. 135–36.

**18.** *See* pages —————— of 198 U.S.App.D.C., pages 856–857 of 613 F.2d *supra.*

It is our view, in sum, that the reasoning of the *Browning* decision is equally applicable in the instant case. We thus conclude that section 437d(b), by granting the power to enforce subpoenas only to those district courts "within the jurisdiction of which any inquiry is carried on," so limits the place of suit for enforcement of Commission subpoenas as to require an implied grant of authority for extraterritorial service of process to effectuate the purpose of the regulatory scheme. Appellants, accordingly, were properly served in New York.[19]

### C.

■ Appellants' final contention is that the District Court erred in denying them at least some opportunity to substantiate their allegations of harassment and retaliation. At the show cause hearing in the District Court, counsel for appellants asserted that the Commission subpoenas were issued in retaliation for two law suits brought by CTEL and the USLP against the Commission. He specifically alleged that "counsel for the . . . Commission has stated as such that if we hadn't brought those actions that they wouldn't have taken actions against the United States Labor Party and the Committee to Elect Lyndon La Rouche." A. 84–85. The District Court, denying appellants' request for "leave to file a written statement within 10 days," later concluded "there is no indication that these subpoenas are part of a scheme to harass respondents." A. 111.

Appellants do not challenge directly the District Court's finding of no harassment inasmuch as they concede that their allegations in this regard were unsubstantiated. Instead, they urge us to conclude that the District Court afforded them an inadequate opportunity to substantiate their allegations that the subpoenas were issued for purposes of harassment and retaliation.

■ It is well settled that an agency may not use its subpoena power "for an improper purpose, such as to harass the [subpoenaed party] or to put pressure on [it] to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *United States v. Powell,* 379 U.S. 48, 58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1964); *accord, United States v. Bisceglia,* 420 U.S. 141, 146, 95 S.Ct. 915, 43 L.Ed.2d 88 (1975). It is equally well settled that the burden of showing an improper purpose is on the subpoenaed party, *United States v. Powell, supra,* 379 U.S. at 58, 85 S.Ct. 248.

In cases involving the enforcement of IRS summonses, several courts have held that, where a summonee raises colorable allegations of an improper purpose and seeks to prove those allegations, the enforcement court must afford the summonee at least some opportunity to substantiate its allegations. *United States v. Church of Scientology,* 520 F.2d 818, 822–25 (9th Cir. 1975); *United States v. McCarthy,* 514 F.2d 368, 372–375 (3d Cir. 1975); *United States v. Salter,* 432 F.2d 697, 699–701 (1st Cir. 1970). To rule otherwise, these courts have noted, would render it virtually impossible for a summonee to prove that a facially valid summons was, in fact, issued for an improper purpose. But in recognition of the potential for delay and burdensomeness to the IRS, these courts have not afforded the summonee with the right to full-blown discovery. Instead, they have held that, as an initial matter, the summonee is entitled only to a preenforcement evidentiary hearing limited to the question whether the summons was issued for a proper purpose.

Relying principally upon these IRS cases, appellants assert that the District Court, by denying their request to file "written mate-

---

**19.** Nor do we find merit in appellants' argument that service on New Solidarity and NCLC was defective because the individuals served on behalf of New Solidarity and NCLC were neither "officer[s]" nor "managing or general agent[s]" of those organizations. *See* Fed.R. Civ.P. 4(d)(3). It appears the individuals who were served held positions of sufficient authori-

ty to satisfy the purposes of Rule 4(d)(3), *see State of Georgia v. National Democratic Party,* 145 U.S.App. 102, 104, 447 F.2d 1271, 1273 n. 2 (D.C.Cir.), *cert. denied,* 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971), and that appellants had adequate actual notice of the hearing to prepare a proper defense, *see Giordani v. Hoffmann,* 295 F.Supp. 463, 469 (E.D.Pa.1969).

rials," failed to provide them with an adequate opportunity to substantiate their allegations of harassment and retaliation on the part of the Commission. This argument, we think, is without merit. It is our view that inasmuch as the record reveals that appellants in fact never sought to avail themselves of an opportunity to substantiate their allegations, they cannot now be heard to complain about the loss of that opportunity.

Turning to the record, we find that appellants first raised the issue of harassment and retaliation not in the papers they filed before the show cause hearing in the District Court, but rather at the hearing itself. There counsel for appellants, in an unsworn statement, asserted that the subpoenas were issued in response to two suits filed by CTEL and the USLP against the Commission and that counsel for the Commission "has stated as such" that the Commission was acting in retaliation to those suits. Then, after discussing the burdensomeness of the subpoenas, counsel for appellants concluded his argument with the following request: "I would like to add, Your Honor, that we consider this a very significant case, and would like leave to file a written statement within 10 days." A. 89. The District Court, after hearing rebuttal argument, rejected appellants' request, noting "I think I will rule on the papers." A. 103.

We read the record as indicating that appellants never requested the District Court to provide them with an opportunity to substantiate their allegations of harassment and retaliation. To be sure, appellants sought permission to submit a "written statement" in connection with their case. But we regard this request, especially since it was not addressed to any one claim in particular, as a request not to substantiate appellants' allegations of harassment and retaliation, but rather to brief all the grounds upon which appellants resisted enforcement. Surely in a summary enforcement proceeding for which appellants had at least two weeks actual notice, the District Court is not to be faulted for denying a request for additional briefing time.[20]

Nor do we read the IRS cases as suggesting to the contrary. Those cases seek to provide a summonee who has raised colorable allegations of an improper purpose underlying a summons with an opportunity *as an evidentiary matter* to substantiate those allegations. In the instant case, appellants' request to submit a written statement was not directed at establishing the truth of their allegations of harassment and retaliation, but rather at informing the District Court of what appellants regarded as the legal consequences of their unsubstantiated allegations. Appellants' reliance on the IRS cases is thus misplaced.

Appellants cannot argue that they improperly were *denied* an opportunity to substantiate their claims when they never *requested* such an opportunity. In the IRS cases upon which appellants rely, the summonees all requested either discovery or an evidentiary hearing to substantiate their claim that a summons had been issued for an improper purpose. Similarly, in the instant case, appellants could have resolved the issue of improper purpose simply by requesting the District Court to conduct a limited evidentiary hearing. This could have been accomplished at the show cause hearing itself through the testimony of counsel for the Commission who allegedly had represented to appellants that the subpoenas were issued in retaliation to the suits brought by CTEL and the USLP.

**20.** In this regard, counsel for appellants argues that he had virtually no time to prepare for the show cause hearing inasmuch as appellants were served, only one day before the hearing. But the record reveals that appellants were served with the subpoenas months before the show cause hearing and that they were notified by counsel of the show cause order two weeks before the hearing date when counsel was served. The fact that appellants retained counsel to represent them at the show cause hearing only one day before the hearing does not detract from the fact that appellants had actual notice of the hearing date two weeks earlier. Accordingly, we agree with the conclusion of the District Court that appellants "cannot reasonably argue that they lacked adequate time to prepare their defense for the hearing." A. 108.

Appellants, however, requested neither discovery nor an evidentiary hearing, and we deem that failure to constitute a waiver.[21] It surely is not the obligation of the District Court *sua sponte* to conduct a preenforcement evidentiary hearing whenever counsel orally suggests an improper purpose. The subpoenaed party must request such a hearing, and, if it fails to do so, the District Court must proceed on the record before it. Accordingly, we conclude that, inasmuch as appellants never requested an opportunity to substantiate their allegations of harassment and retaliation, they waived their right to such an opportunity.

### III

It is our view, in sum, that (1) inasmuch as the District of Columbia was a place where the Commission's "inquiry [was] carried on" within the meaning of section 437d(b), the District Court had subject matter jurisdiction to entertain this enforcement petition, (2) insofar as section 437d(b) authorizes extraterritorial service of process, appellants were properly served in New York, and (3) inasmuch as appellants never requested an opportunity to substantiate their allegations of harassment and retaliation, they waived their right to such an opportunity. Accordingly, we affirm the decision under review.

*It is so ordered.*

---

21. Our conclusion that appellants waived their right to substantiate their claims of harassment and retaliation is not, we think, inconsistent with two other cases, *United States v. Church of Scientology, supra,* 520 F.2d at 825; *United States v. McCarthy, supra,* 514 F.2d at 376–77, where courts declined to imply a waiver of the right to a preenforcement evidentiary hearing. In those cases, which involved IRS summonees who had requested discovery rather than a preenforcement evidentiary hearing, the courts concluded that it would be unduly harsh to imply a waiver of the right to such a hearing. In the instant case, however, appellants requested neither discovery, an evidentiary hearing, nor any other legal mechanism to substantiate their factual allegations of harassment and retaliation. It is not unduly harsh, we think, to imply a waiver under the circumstances presented here.