**Edward W. SPANNAUS, Treasurer of The LaRouche Campaign, The LaRouche Campaign, Frederic Henderson, Patrick K. Barrett, Terry Edward Allen, Plaintiffs,**

v.

**FEDERAL ELECTION COMMISSION, Defendant.**

No. 85 Civ. 0404 (LLS).

United States District Court, S.D. New York.

Aug. 25, 1986.

1522

Anderson & Associates, P.C., Boston, Mass., for plaintiffs; Odin P. Anderson, Robert L. Rossi, Tracy Roach, Boston, Mass. and Mayer Morganroth, New York City, of counsel.

Federal Election Com'n, Washington, D.C., for defendant; Charles N. Steele, Gen. Counsel, Ivan Rivera, Asst. Gen. Counsel, Robert W. Bonham, III, of counsel.

STANTON, District Judge.

The LaRouche Campaign ("TLC"), TLC's treasurer Edward Spannaus, Frederic Henderson, Patrick K. Barrett and Terry Edward Allen brought this action against the defendant Federal Election Commission ("FEC" or "Commission") for declaratory and injunctive relief, alleging that the Commission's investigative, enforcement and other regulatory actions against TLC are motivated by bad faith and are interfering

with plaintiffs' campaign activities and infringing their First Amendment rights. The Commission moves pursuant to Fed.R. Civ.P. 56(b) for summary judgment on the grounds that plaintiffs cannot demonstrate either (1) bad faith or an improper purpose on the part of the Commission or (2) an infringement of their First Amendment rights. The motion is granted.

### The Parties

Plaintiff TLC is the principal authorized campaign committee for the 1984 presidential primary campaign of Lyndon H. LaRouche, Jr., who was a candidate for the Democratic Party nomination for President of the United States in 1984. Plaintiff Spannaus is the Treasurer of TLC and is responsible for reporting TLC contributions and expenditures under the Federal Election Campaign Act of 1971, as amended (2 U.S.C. § 431 *et seq.*) ("the Act"); plaintiff Henderson is a volunteer worker for TLC, who solicits campaign contributions; and plaintiffs Barrett and Allen are contributors to TLC and otherwise support its campaign activity. Defendant FEC is the agency of the federal government charged with the administration and civil enforcement of the Act and of the Presidential Primary Matching Payment Account Act, as amended (26 U.S.C. § 9031 *et seq.*) ("the Matching Fund Act").

### Background

On October 21, 1983 TLC registered with the FEC as the principal authorized campaign committee to support the candidacy of Lyndon H. LaRouche for the 1984 Presidential nomination of the Democratic Party. It applied in December 1983 to the FEC for certification of eligibility to receive federal primary matching funds for use in the 1984 campaign. On January 26, 1984 the Commission, following the recommendation of its General Counsel, preliminarily decided to deny certification of eligibility to TLC. TLC appealed the determination to the United States Court of Appeals for the District of Columbia, and on

April 4, 1984 that appeal was dismissed. The Commission did certify TLC as eligible to receive federal primary matching funds on April 12, 1984. TLC has received approximately $500,000 in such funds.

From July 23 to August 21, 1984 the Commission conducted a routine audit of TLC, as required by 26 U.S.C. § 9038(a) ("the Commission shall conduct a thorough examination and audit of the qualified campaign expenses of every candidate and his authorized committees who received [matching funds]"). On November 15, 1984 the Commission approved an interim audit report for TLC, *see* 11 C.F.R. § 9038.-1(c)(1) ("[a]fter the completion of the fieldwork [portion of the audit] ... the Commission will issue an interim audit report to the candidate and his or her authorized committee"), which notified TLC that "[a] matter noted during the audit was referred to the Office of the General Counsel" for review and possible investigation. The Commission received TLC's response to the report on December 19, 1984. *See* 11 C.F.R. § 9038.1(c)(2) ("[t]he candidate ... will have an opportunity to submit, in writing, ... legal and factual material disputing or commenting on the ... interim audit report").

Between about October 1, 1984 and January 16, 1985, the date plaintiffs filed this law suit, the Commission notified Spannaus by letter of the opening of ten Matters Under Review ("MURs")[1] involving possible violations of the Act and the Matching Fund Act by plaintiffs TLC and Spannaus. Eight of those MURs are complaint-generated, i.e., based on sworn complaints various persons have filed with the Commission, and two (numbers 1797 and 1852) are internally-generated, i.e., based on findings made by the Commission in the normal course of performing its functions. *See* 2 U.S.C. § 437g(a)(2) ("[i]f the Commission, upon receiving a complaint ... or on the basis of information ascertained in the normal course of carrying out its supervisory

---

1. The Commission's enforcement cases under 2 U.S.C. § 437g are designated numerically for

internal purposes as "MUR ____".

responsibilities, determines ... that it has reason to believe that a person has committed, or is about to commit, a violation of this Act or [the Matching Fund Act], ... the Commission shall ... make an investigation of such alleged violation ...").

The Commission opened MUR 1797 based in part upon a letter it received, which indicated both that TLC might have accepted from the letter's author contributions in excess of the amount permitted by the Act and that TLC might have accepted contributions from a corporation, also in violation of the Act. Although the letter was unsworn and thus could not be the basis of a complaint-generated MUR, the Commission found reason to believe plaintiffs had violated the Act based on the letter and on information found in a review of TLC's reports of receipts and expenditures on file at the FEC.

The Commission opened MUR 1852 based upon the information referred to it by the Audit Division during its audit of TLC and upon information brought to the attention of the General Counsel's Office in the form of "proper and improper complaints and other inquiries." FEC Local Rule 3(g) Statement, ¶ 17.

A letter notifying TLC of the Commission's "reason to believe" finding in MUR 1797 was mailed to TLC on October 2, 1984. A letter notifying it of the "reason to believe" finding in MUR 1852 was allegedly mailed on December 21, 1985 but plaintiffs claim they did not receive that letter and were not formally notified of the MUR until December 29, 1984, after several TLC contributors informed TLC they were being questioned by FEC investigators and TLC's attorney telephoned the Commission to ask why it was approaching the contributors.

In connection with MUR 1852 the Commission mailed to TLC a subpoena for documents and an order to answer interrogatories. It also mailed contributor verification letters and questionnaires to a number of individuals who were reported by TLC to be contributors to the committee, including plaintiffs Barrett and Allen. TLC and Spannaus made a timely motion to quash or modify the subpoena on the grounds that it was without statutory authority, in bad faith and overly broad. The motion was denied by the Commission on January 31, 1985. The FEC has applied to this court pursuant to 2 U.S.C. § 437d(b) for enforcement of that subpoena. That petition is decided separately today in *Fed. Elec. Com'n v. TLC*, M18–304 (LLS) and is not under consideration here.

Since the filing of this law suit, the Commission has determined pursuant to 2 U.S.C. § 437g(a)(2) that there is no reason to believe that violations of the Act have occurred with respect to three of the original ten MURs, and found reason to believe violations occurred in five of the MURs and merged those matters with MUR 1852. The Commission also notified plaintiffs Spannaus and TLC of the opening of twelve additional MURs (ten complaint-generated and two internally-generated), four of which have since been closed when the Commission found no reason to believe that violations had occurred. It found reason to believe violations of the Act had occurred in seven of the MURs, and merged six of them with MUR 1852.

### Discussion

Plaintiffs claim that the Commission transgressed its statutory guidelines in its investigations, and even where it has followed statutory procedures its actions are motivated by bad faith and have infringed plaintiffs' First Amendment rights.

### A. Summary Judgment Standards

Summary judgment will be granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Schwabenbauer v. Board of Education et al.*, 667 F.2d 305, 313 (2d Cir.1981). "Not only must there be no genuine issue as to evidentiary facts, but there must also be no controversy as to the inferences to be drawn from them." *Ibid.*; *Cali v. Eastern Airlines, Inc.*, 442 F.2d 65, 71 (2d Cir.1971) (summary judgment is inappropriate where the undisputed facts disclose competing material inferences as to which reasonable minds can differ). "In

determining whether or not there is a genuine factual issue, the court should resolve all ambiguities and draw all reasonable inferences against the moving party." *Schwabenbauer v. Board of Education,* 667 F.2d at 313; *Goshen Litho, Inc. v. Kohls,* 582 F.Supp. 1561, 1563 (S.D.N.Y. 1983). "The moving party is 'entitled to judgment as a matter of law' [where] the non-moving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett,* — U.S. —, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

A material issue of fact alleged here is the Commission's motive or intent concerning its investigations of plaintiffs. Plaintiffs assert that the Commission's intent was to harass them. Summary judgment is usually inappropriate where " 'the inferences which the parties seek to have drawn deal with questions of motive, intent, and subjective feelings and reactions.' " *Cali v. Eastern Airlines, Inc.,* 442 F.2d at 71, (quoting *Empire Electronics Co. v. United States,* 311 F.2d 175, 180 (2d Cir.1962)). Nevertheless, "it is an overstatement to contend that summary judgment may never be justified in such cases." *Morgan v. Prudential Group, Inc.,* 527 F.Supp. 957, 959 (S.D.N.Y.1981), *aff'd* 729 F.2d 1443 (2d Cir.1983). It is appropriate "when the movant party can show that the nonmovant party's interpretation [of the facts] is unreasonable". *See Goshen Litho, Inc. v. Kohls,* 582 F.Supp. at 1565; *New York State Energy Research and Development Authority v. Nuclear Fuel Services, Inc.,* 666 F.2d 787 (2d Cir.1981).

**B.  Plaintiffs' Allegations, and their Merits**

**1.  Matching Fund Certification**

Plaintiffs claim that there was no legal basis for the Commission's initial decision to deny TLC eligibility for matching funds, since TLC's application for them fully complied with the requirements of the statute.

Moreover, plaintiffs claim the denial was improper because certain FEC employees involved in the review of TLC's application openly disagreed with LaRouche's political and social ideas. Plaintiffs assert that as a result of the Commission's decision, LaRouche was denied placement on the ballot for the North Carolina primary election and his campaign was "unable to commence its activities on the scale and to the extent that it otherwise would have been allowed." Plts.Mem., p. 3.

■ The Commission's decision appears legally sound.[2] Its initial recommendation to deny was based upon the failure by LaRouche and his 1980 campaign committee, Citizens for LaRouche, to pay to the FEC a $54,671.84 repayment determination from LaRouche's 1980 campaign and a $15,000 civil penalty. *See* Complaint, ¶ 25; FEC Exh. 1, Mem. to Commission Concerning Eligibility of LaRouche to Receive Funds. To be eligible for funds, a candidate must agree to pay the amounts that the FEC determines are owed based on its audits of the candidate's campaign. 26 U.S.C. § 9033(a)(3). LaRouche submitted such an agreement in connection with his 1984 campaign, but the FEC found it to be inadequate because LaRouche had failed to honor a virtually identical agreement made in connection with his 1980 presidential campaign. *See* Exh. 1, Statement of Reasons, p. 11 ("to deem Mr. LaRouche eligible to receive such matching funds on the basis of certifications and agreements upon which the Commission cannot depend would be to undermine the entire purpose of the eligibility requirements established at 26 U.S.C. § 9033 and in the Commission's regulations.")

In April 1984 the FEC did certify TLC to receive federal matching funds, after LaRouche and his former campaign committee paid in full the repayment and civil penalty amounts. *See* Complaint, ¶ 27.

In a suit by LaRouche challenging his lack of placement on the North Carolina

---

**2.** The applicable standard of review of agency action where, as here, that action is not subject to formal rulemaking procedures, is whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law". 5 U.S.C. § 706(2)(A); *see Com. to Elect Lyndon LaRouche v. Fed. Elec. Com'n,* 613 F.2d 834, 836 n. 20 (D.C.Cir.1979).

ballot as a result of the initial denial of certification, the Court of Appeals for the Fourth Circuit held that since the FEC legitimately denied LaRouche eligibility to receive funds, the North Carolina State Board of Election properly decided not to put his name on the ballot. *LaRouche v. State Board of Elections*, 758 F.2d 998, 1000 (4th Cir.1985).

■ Plaintiffs contend that the decision to deny TLC eligibility was motivated by bad faith since certain FEC employees involved in the review of TLC's application for eligibility openly disagree with LaRouche's ideas. The sole basis for this contention is testimony by an FEC employee that he and other FEC employees in the Audit Division "don't see eye-to-eye" with LaRouche. Plts.Exh. B, Stoltz Deposition, p. 198. Mr. Stoltz continued "[o]f course, I don't see eye-to-eye with many of the candidates on many things, and I don't think that I would be unusual in that sense." *Ibid.* Absent further connection with the Commission's determination, this testimony fails to raise an issue of fact regarding the propriety of the FEC's handling of the application.

## 2. Audit

The FEC conducted a routine audit of TLC in July and August 1984. Plaintiffs claim that (1) there was an inordinate delay of three months between the time the fieldwork portion of the audit was completed and the date the interim audit report was provided to TLC; (2) the report TLC received stated that "[a] matter noted during the audit was referred to the Office of General Counsel", yet TLC never received any factual specifics as to the nature of the matter referred; and (3) the FEC began preparations to contact TLC contributors regarding the matter to be referred, even before the matter was in fact referred.

### (1) *Inordinate delay*

■ The fieldwork portion of the audit was completed on August 21, 1984. TLC received its copy of the audit report on November 19, 1984. The statute imposes no time limit by which the Commission must issue its report following an audit. The Commission states that its "review of [the audit report] was unavoidably delayed for several months due to the then unusually heavy workload of the staff in the General Counsel's Office ... [and] is in no way attributable to bad faith on the part of the Commission." Exh. 54, Gross Aff., ¶ 9. Plaintiffs allege no facts demonstrating that the delay they experienced in receiving the report reflects anything other than the Commission's heavy workload, or indeed differed from that suffered by other candidates during the same time period.

### (2) *Specificity*

■ It seems to be conceded that the interim audit report provided to TLC in November 1984 did not contain factual particulars about the matter referred to the General Counsel's Office. However, plaintiffs point to no statutory provision or regulation that obliges the FEC to supply plaintiffs with that information. Only when the Commission has determined by the vote of four of its members that there is reason to believe a candidate has committed a violation of the Act is it required to "notify the person of the alleged violation.... [and] ... set forth the factual basis for such alleged violation." 2 U.S.C. § 437g(a)(2). This the Commission did. When it reviewed the matter referred to it by the Audit Division (which concerned debit adjustments to credit card transactions) the Commission found reason to believe TLC and Spannaus had violated the Act, and it accordingly opened MUR 1852. Pursuant to the statute (2 U.S.C. § 437g(a)(2)) it notified plaintiffs of this determination and set forth the factual basis of the finding. *See* Exh. 22.

### (3) *Premature investigation*

While plaintiffs say that "preparations"[3] to contact TLC supporters and to investi-

---

**3.** The actions of which plaintiffs complain apparently involve the preparation by the FEC of a sample population of contributors to TLC who contributed by credit card. *See* Exh. B, Stoltz Dep., pp. 105–06.

gate TLC were made before the matter was referred to the General Counsel's Office, this charge is not substantiated by the deposition cited by plaintiffs. *See* Exh. B, Stoltz Dep., pp. 103–111. Nor do plaintiffs show that internal preparations, made before notifying the party who is to be investigated, contravene the Act or its implementing regulations.

### 3. MURs ("Matters Under Review")

### (a) MUR 1852

Plaintiffs allege that (1) TLC contributors were contacted in regard to MUR 1852 before TLC was made aware of the MUR; (2) the FEC noticed and conducted depositions of third parties in connection with MUR 1852 without notice to TLC; and (3) the factual basis provided to TLC for opening the MUR was not specific or detailed, precluding TLC from exercising its statutory right to respond in a meaningful fashion, and did not justify opening MUR 1852.

MUR 1852 was opened pursuant to the Commission's duty to investigate possible violations of the Act which it discovers in the course of its normal supervisory activities. 2 U.S.C. § 437g(a)(2). MUR 1852 involves possible unauthorized credit card transactions and was referred to the Commission by the Audit Division.

### (1) *Contacting of Contributors*

■ Plaintiffs complain that TLC contributors were contacted in connection with MUR 1852 before plaintiffs were notified of it, which "prevented [TLC's] volunteers from explaining [to contributors] why [the verification] letters were being sent by the government." Plts.Mem. at 9.

As part of its investigation, the Commission sent questionnaires to some of TLC's contributors. It claims that on December 21, 1984 it mailed both the letter to TLC notifying it of the Commission's decision to investigate and the verification letters to TLC contributors. *See* Exh. 63, Weissenborn Aff., ¶ 3. ("In mid-afternoon on Friday, December 21, 1984, I caused to be delivered to the Commission's mail room for posting the letter of notification [of the opening of MUR 1852] to be sent to the

committee, together with the accompanying subpoena and order, and the letters to be sent to individual contributors"). On December 27, 1984 the FEC received a telegram from Spannaus stating that TLC had not received notification of the "reason to believe" finding in MUR 1852, but had learned that some of its contributors had received the questionnaires. The Commission also received a telephone call from counsel for TLC who, when told that the notification had been mailed on December 21, 1984, asked that another copy be sent to TLC. It was sent that same day and received by TLC on December 29, 1984. Thus on their own view of the facts plaintiffs received notice of MUR 1852 about a week after the FEC wrote TLC's contributors.

Nothing in the Act or implementing regulations obliges the Commission to notify a candidate or his campaign when it issues discovery requests to third parties. *Cf. S.E.C. v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 741, 104 S.Ct. 2720, 2725, 81 L.Ed.2d 615 (1984) (federal administrative agency may use its subpoena power to gather from third parties evidence adverse to person under investigation without notifying that person). The statute requires only that both notification to a candidate and investigation activities occur after the Commission has made a "reason to believe" finding. *See* 2 U.S.C. § 437g(a)(2).

### (2) *Third-Party Depositions*

■ Similarly, nothing in the Act prohibits the FEC from conducting depositions of third parties (contributors) without notice to TLC. *Cf. S.E.C. v. Jerry T. O'Brien, Inc.*, 467 U.S. at 741, 104 S.Ct. at 2725.

### (3) *Specificity and Adequacy of Factual Basis*

Plaintiffs also contend that the FEC failed to provide plaintiffs TLC, Barrett and Allen with specific information concerning the issues underlying MUR 1852.

■ Plaintiffs Allen and Barrett, as contributors to TLC, are not entitled to such information regarding the investiga-

tion as part of which they are being contacted. Plaintiffs TLC and Spannaus are entitled to notification pursuant to 2 U.S.C. § 437g(a)(2) and 11 C.F.R. § 111.9(a) ("the Commission ... shall notify such respondent of [its] finding by letter, setting forth the sections of the statute or regulations alleged to have been violated and the alleged factual basis supporting the finding"). They were provided that notification by letter dated December 29, 1984, which set forth the sections of the Act and of the Matching Fund Act which TLC was alleged to have violated, and a summary of those factual allegations. *See* Exh. 22. The notification adequately met the FEC's statutory obligation.

Plaintiffs also assert that the factual basis of the matter referred during the audit was insufficient to justify the opening of MUR 1852. They say that "only one complaint and one cancelled check were possibly related to the debit adjustments noted during the Audit", Plts. Local Rule 3(g) Statement ¶ 11, and that the number of credit card transactions that were subsequently debited—1% of the loan sample items and 2% of the contribution sample items—were neither "large nor significant" as characterized by the audit division in its referral of the matter to the General Counsel. *Id.* at ¶ 12.

The strength of the factual support for the Commission's findings at this stage of its investigation is not ripe for review by this court. *See Federal Trade Commission v. Standard Oil Co. of Cal.,* 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980). "The test for ripeness for review of agency determinations ... requir[es] the Court to evaluate (1) the fitness of the issues for judicial decision, including a determination of whether the issue tendered is legal or factual, and whether the conduct is 'final agency action' within § 10 of the Administrative Procedure Act, 5 U.S.C. § 704; and (2) the hardship to the parties of withholding court consideration." *Reader's Digest Association, Inc. v. Fed. Elec. Com'n,* 509 F.Supp. 1210, 1213 (S.D.N.Y.1981). Under that test, it has been held that a "reason to believe" finding by a federal agency is not ripe for review, *see Fed. Trade Com'n v.*

*Standard Oil Co. of Cal.,* 449 U.S. 232, 241, 101 S.Ct. 488, 494 (FTC "reason to believe" finding is "threshold determination that further inquiry is warranted" and not final agency decision ripe for review); *cf. E.E.O.C. v. Shell Oil Co.,* 466 U.S. 54, 72 n. 26, 104 S.Ct. 1621, 1633 n. 26, 80 L.Ed.2d 41 (1984) (when deciding whether to enforce subpoena issued by EEOC in investigatory stage, court does not determine whether charge of discrimination is "well-founded" or "verifiable"), unless particular circumstances show a cognizable injury or burden on the party being investigated. *Compare Reader's Digest Association, Inc. v. Fed. Elec. Com'n,* 509 F.Supp. at 1213–14 (rule deferring judicial scrutiny of "reason to believe" finding until later stage not applicable where FEC is investigating magazine in connection with press activities that might be statutorily exempted from investigation, and investigation is intimidating magazine's editorial policy). Here, plaintiffs will suffer no cognizable burden if the investigation of MUR 1852 is allowed to proceed without judicial interference. (Their claims of intentional harassment on the part of the FEC and of infringement of their First Amendment rights are discussed below). The only real burden on plaintiffs is responding to the FEC's inquiries which, while perhaps substantial, is "different in kind and legal effect from the burdens attending what heretofore has been considered to be final agency action." *Fed. Trade Com'n v. Standard Oil Co. of Cal.,* 449 U.S. at 242, 101 S.Ct. at 494; *see Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (regulations which forced manufacturers to risk serious criminal and civil penalties for noncompliance or change all their labels, advertisements, and promotional materials, destroy stocks and invest in new supplies imposes such burden on party as to be "final agency action" ripe for review). Moreover, the statute itself provides plaintiffs with further procedural safeguards after the investigation and a "probable cause" finding has been made. *See* 2 U.S.C. § 437g(a)(3), (4)(A)(i) and (6)(A).

Under these circumstances, it would be improper for the court to review the FEC's "reason to believe" finding at this stage in the administrative process. Judicial review at such a premature stage would "interfere[ ] with the proper functioning of the agency and ... burden ... the courts." *F.T.C. v. Standard Oil Co. of Cal.*, 449 U.S. at 242, 101 S.Ct. at 494.

### (b) MUR 1797

Plaintiffs allege that (1) MUR 1797 was improperly commenced by a complaint letter to the FEC that was not sworn to by the complainant; and (2) TLC was not properly notified of the complaint.

### (1) *Unsworn Complaint*

■ The FEC does not deny that the letter that was a partial basis for the opening of MUR 1797 was not sworn to by its author. Section 437g(a)(1) requires that a complaint filed with the FEC which serves as the basis of the opening of a complaint-generated matter "be in writing, signed and sworn to by the person filing such complaint". MUR 1797, however, is not a complaint-generated matter. It was opened based upon both information contained in that letter and "other information ascertained by the Commission in the normal course of carrying out its supervisory responsibilities." FEC Local Rule 3(g) Statement, ¶ 16. As the MUR is internally-generated, the letter upon which it is partially based need not be sworn to.

### (2) *Copy of Complaint to Plaintiffs*

■ Similarly, since the unsworn letter did not comply with the statute or serve as the basis of a complaint-generated MUR, the FEC was not required to send a copy of the complaint to plaintiffs TLC and Spannaus. The Commission notified TLC of the letter at the time it notified TLC of its reason to believe a violation of the Act had occurred, thereby opening MUR 1797. *See* U.S.C. § 437g(a)(2).

### (c) Other MURs

Plaintiffs claim that (1) the notifications sent to TLC in connection with the "reason to believe" findings in seven MURs (Nos. 1793, 1798, 1827, 1862, 1877, 1905 and 1976) provide an insufficient factual basis to enable TLC to make a meaningful response; (2) the FEC has made "reason to believe" findings and assigned MUR numbers to complaints that concern TLC's alleged failure to make loan repayments, a matter which plaintiffs assert is not within the FEC's jurisdiction; and (3) the FEC improperly merged twelve MURs with MUR 1852.

### (1) *Factual Basis of MURs*

■ Each of the notifications sent to TLC in connection with the seven MURs listed, like that for MUR 1852, appears satisfactorily to meet the FEC's statutory obligation of notification. The notifications set forth "the sections of the statute or regulations alleged to have been violated and the alleged factual basis supporting the finding." 11 C.F.R. § 111.9(a); *see* Exhs. 9, 14, 19, 26, 30, 34 and 40.

### (2) *MURs Involving Creditor Disputes*

Plaintiffs claim that the Commission has opened a number of MURs that involve "disputes over the repayment of loans to contributors" and failed immediately to terminate those MURs, even though matters involving creditor disputes are outside its jurisdiction and instead subject to state law.

■ The FEC's actions are a legitimate exercise of its powers. Although the Commission has indicated that it will not resolve creditor disputes, it still has responsibility for ensuring that debts are correctly reported. *See* 2 U.S.C. § 434(b)(8) and 11 C.F.R. §§ 104.3(d) and 104.11. The Commission's regulations state that if a loan from a contributor is settled for less than full satisfaction of the debt, an unlawful contribution may result. *See* 11 C.F.R. §§ 100.7(a)(4); 104.11(a) and 114.10. Thus the Commission has jurisdiction to review some debt disputes.

■ Moreover, several of the complaints filed with the Commission, which TLC claims are "debt disputes" and outside the FEC's jurisdiction, involve TLC's re-

porting as loans or contributions money which was allegedly given for other purposes, or not given voluntarily. These are not simply debt collection issues but involve the filing of false reports. That is within the FEC's jurisdiction.

The FEC was required to open a MUR for each complaint it received involving debt disputes. It is required by the Act to begin administrative proceedings on every complaint it receives that complies with the Act. 2 U.S.C. § 437g(a)(1). If it fails to do so, it is subject to suit by the party filing the complaint. 2 U.S.C. § 437g(a)(8). If the FEC finds during its initial review of the matter that it is one outside its jurisdiction, it will close the MUR. The FEC claims that it has dismissed all of the MURs involving only debt disputes. In any event, plaintiffs do not allege that any of the matters for which they complain the FEC lacks jurisdiction involve ongoing investigations or otherwise harm plaintiffs, and the Act establishes no time limit by which the FEC must dismiss a complaint.

### (3) Merger

■ Plaintiffs complain that the FEC has merged with MUR 1852 a number of MURs which "do not involve the same or similar allegations as those in MUR 1852" and TLC has "expressed concern over the effect of the merger and requested an explanation of [its] significance". Plts. Local Rule 3(g) Statement, ¶¶ 33–35. The FEC merged other MURs with MUR 1852 for administrative purposes. See FEC Reply Mem. at 23 n. 22 and Gross Aff. at 306. Plaintiffs show no specific harm to them as a result of the merger or any facts demonstrating that the merger is improper.

### 4. Equal Protection

■ Plaintiffs assert that the Commission is selectively and discriminatorily enforcing the federal election laws in violation of plaintiffs' rights to equal protection. To support this allegation, TLC contends that the FEC entered into a conciliation agreement with the Mondale For President Committee, Inc. without conducting any investigation of that Committee's activities, but has refused to negotiate a similar conciliation agreement with plaintiffs TLC and Spannaus and instead has insisted on conducting an investigation.

In fact, the Commission did conduct a preliminary investigation into alleged violations by the Mondale for President Committee. See Exh. 54, Gross Aff., ¶ 11. Moreover, several respondents to the Mondale Committee MUR requested "pre-probable cause conciliation", see C.F.R. § 111.18(d), which the FEC voted to deny until it had conducted an investigation and had enough information regarding the amount of excessive contributions involved to negotiate a conciliation agreement with the Committee. A conciliation agreement followed. The pending TLC MURs involve violations different from the Mondale Committee MUR, and plaintiffs TLC and Spannaus apparently have not submitted a request for pre-probable cause conciliation. Finally, unlike the Mondale Committee, plaintiffs have never expressed a willingness to admit any violations of the Act, but rather insist that no violations have occurred.

Plaintiffs have not alleged facts demonstrating unequal treatment under the Act.

### 5. Criminal Investigation

■ In the spring of 1985 the Commission voted to report certain matters concerning TLC and to provide necessary documentation to the U.S. Attorney in Boston. The scope of the report included the facts alleged in MUR 1852.

Plaintiffs allege that the Commission is improperly continuing its civil investigation of MUR 1852 because the Commission voted to forward information in its possession related to that MUR to the Justice Department for criminal prosecution. They assert that once the FEC has reported a possible violation to the Justice Department it cannot continue to pursue its own civil investigation of the same matter.

The Commission is authorized "to report apparent violations to the appropriate law enforcement authorities", 2 U.S.C. § 437d(a)(9), and to refer to the Attorney General of the United States for possible criminal prosecution a "probable cause to

believe" finding of a "knowing and willful violation" of the Act or of the Matching Fund Act. 2 U.S.C. § 437g(a)(5)(C). Pursuant to 2 U.S.C. § 437d(a)(9), the Commission referred to the Department of Justice documents detailing the various unauthorized credit card transactions arising out of MUR 1852, for the Department's consideration of potential violations of applicable credit card fraud statutes.

The Commission may, after reporting a matter to the Justice Department, continue to pursue its own civil investigation of the matter. *See United States v. Kordel*, 397 U.S. 1, 11, 90 S.Ct. 763, 769, 25 L.Ed.2d 1 (1970) ("It would stultify enforcement of federal law to require a governmental agency ... invariably to choose either to forgo recommendation of a criminal prosecution once it seeks civil relief, or to defer civil proceedings pending the ultimate outcome of a criminal trial"); *Securities and Exchange Commission v. Dresser Industries, Inc.*, 628 F.2d 1368, 1374–76 (D.C. Cir.), *cert. denied*, 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980). Only where the government brings the civil action "solely to obtain evidence for its criminal prosecution", *U.S. v. Kordel*, 397 U.S. at 11–12, 90 S.Ct. at 769–770, or other circumstances suggest that the parallel proceedings are unconstitutional or improper, should the court stay civil proceedings (or postpone civil discovery) pending the outcome of criminal proceedings. *See ibid; Securities and Exchange Com'n v. Dresser Industries, Inc.*, 628 F.2d at 1375 ("a court may decide in its discretion to stay civil proceedings ... 'when the interests of justice seem[ ] to require such action' ", quoting *U.S. v. Kordel*, 397 U.S. at 12, n. 27, 90 S.Ct. at 770, n. 27).

Plaintiffs have alleged no facts to suggest that the FEC is primarily gathering facts in MUR 1852 for criminal prosecution, nor do any special circumstances suggest that the parallel proceedings are improper. Plaintiffs allege generally that "it is not a good faith pursuit of a congressionally authorized purpose if the reason for subpoena enforcement is the gathering of evidence for use in a criminal prosecution." Plts.Mem. at 35–6. While that may be true

as a general proposition, here plaintiffs have produced no evidence to show that is the purpose of the FEC's gathering of the evidence.

6. Conspiracy

Plaintiffs claim that the Commission's investigative actions concerning plaintiffs are part of an overall plan to harass or intimidate persons associated with LaRouche because they are "being taken at a time when other entities, such as the Federal Bureau of Investigation, the Secret Service, and various financial institutions, are conducting activities against Mr. LaRouche and his associates." Complaint, ¶ 59. The FEC states that it "is neither aware of, nor participating with any other person or entity in, any conspiracy against either Lyndon LaRouche or persons or entities associated with, or sharing the goals and policies of, Mr. LaRouche". Exh. 54, Gross Aff., ¶ 8. Plaintiffs offer no facts to support their charge that the contemporaneous investigation or enforcement actions stem from a conspiracy.

7. Confidentiality

Plaintiffs assert that "[t]hroughout the events set forth herein, the FEC has violated the requirement of confidentiality that the federal election laws impose." Complaint, ¶ 56. Title 2 U.S.C. § 437g(a)(12)(A) provides that "[a]ny notification or investigation made under this section shall not be made public by the Commission or by any person without the written consent of the person receiving such notification or the person with respect to whom such investigation is made." Specifically, plaintiffs contend that individuals in the FEC Public Records Section have informed the news media of complaints against Spannaus and TLC. Plaintiffs aver that this has encouraged TLC contributors to revoke their contributions and loans and has "eroded public confidence in the plaintiffs, deflated support and irreparably damaged business relations". Complaint, ¶ 57. Plaintiffs have submitted an affidavit by

Sharon Wright, a reporter for a Boston TV station, who states that an FEC employee in the FEC Press Office told her of credit card irregularities by the LaRouche Campaign which the FEC was investigating.

Breaches of the Act's confidentiality provisions by one or more individual employees of the FEC are reprehensible and punishable, *see* 2 U.S.C. § 437g(a)(12)(B), but they do not of themselves demonstrate bad faith on the part of the Commission. Plaintiffs must show that the "institutional posture" of the FEC was to proceed against LaRouche in bad faith. *Cf. United States v. La Salle National Bank*, 437 U.S. 298, 313–16, 98 S.Ct. 2357, 2365–67, 57 L.Ed.2d 221 (1978); *United States v. Schutterle*, 586 F.2d 1201, 1203 n. 4 (8th Cir.1978) (motives of individual agent do not control; rather, purposes of institution as a whole must be considered). The FEC states that it "has never adopted a policy to violate the Act's confidentiality provisions with respect to plaintiffs TLC or Spannaus, nor has the Commission directed or authorized any present or former FEC employee to disclose information regarding TLC or Spannaus in violation of those provisions." Exh. 54, Gross Aff., ¶ 13.

Although the employee's breach of confidence is tendered to show bad faith on the part of the FEC in its investigation, for the FEC to initiate the investigation of a particular candidate, it must determine by the affirmative vote of at least four of its members that there is reason to believe a violation has occurred. The statute provides procedures to ensure that the decision to investigate and to enforce the provisions of the Act is made by the Commission itself, and not on the whim of a particular employee. *See* 2 U.S.C. § 437g; *cf. United States v. La Salle National Bank*, 437 U.S. 298, 313–16, 98 S.Ct. 2357, 2365–67 (layers of review involved in decision to issue IRS summons provide taxpayer with substantial protection against bad faith motive of individual agent).

C. Claimed Bad Faith and Harassment by Commission

As discussed above, plaintiffs point to no statutory provisions that have been violated by the FEC in its actions regarding TLC. The Commission avers that "each of the actions taken by [it] with respect to plaintiffs was undertaken for legitimate purposes. None of the actions which are recited in the complaint in this litigation were undertaken by the Commission for an improper purpose." Exh. 54, Gross Aff., ¶ 6. It states that "[a]ll Matters Under Review involving plaintiffs TLC and Spannaus have been initiated and handled in accordance with the procedures established by [the statute and regulations] ... [and] [t]he procedural actions undertaken by the Commission in those MURs have all been substantially similar to actions taken by the Commission in other recent enforcement matters." *Id.* at ¶ 10. Plaintiffs' allegations are unsupported by specific facts demonstrating bad faith and improper purpose. *See Schoenbaum v. Firstbrook*, 405 F.2d 200, 209 (2d Cir.1968), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978) (a nonmoving party may not rely on mere conclusory allegations but must set forth "concrete particulars"); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980) (one opposing summary judgment motion may not rest on mere conclusory allegations or denials but, rather, must bring to the district court's attention some affirmative indication that his version of the relevant events is not fanciful).

Where a regulatory agency is legitimately and properly conducting an investigation or otherwise exercising its statutory authority, the burden of showing that the agency's actions are motivated by bad faith or an improper purpose is on the party being investigated. *Cf. United States v. Powell*, 379 U.S. 48, 58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1964) (burden of showing that summons has been issued for improper purpose is on taxpayer). Plaintiffs have not met that burden. *Cf. United States v. Gel Spice Co., Inc.*, 601 F.Supp. 1214, 1218 (E.D.N.Y.1985) (before obtaining evidentiary hearing on issue of government agency's good faith in investigating possi-

ble civil violations, defendants must make "substantial preliminary showing of bad faith"); *FEC v. Committee to Elect LaRouche,* 613 F.2d 849, 862 (D.C.Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980) (one resisting a summons must raise at least "colorable allegations" of an improper purpose before court must afford him opportunity to substantiate his allegations); *see Securities and Exchange Commission v. Howatt,* 525 F.2d 226, 229 (1st Cir.1975) (evidentiary hearing as to agency's intent not required without "meaningful evidence" of an improper purpose by the agency). It has been remarked that

> [u]nsupported allegations of bad faith and improper purpose are often made against regulatory agencies to hinder administrative investigations.... Such attempts to undermine the enforcement process should not be tolerated; allegations of bad faith and improper purpose must be buttressed with specific facts.

*United States v. Juren,* 687 F.2d 493, 494 (Temp.Emer.Ct.App.1982); *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1497, 75 L.Ed.2d 929 (1983); *United States v. RFB Petroleum, Inc.,* 703 F.2d 528, 532 (Temp.Emer.Ct. App.1983). No such specific facts have been shown. The allegations of bad faith and improper purpose are unsupported. Moreover, while plaintiffs assert that they have not had sufficient discovery on this point because the FEC has not been responsive to their requests, they have failed to make even a preliminary showing of bad faith and accordingly are not entitled to discovery into the FEC's motives and activities. *Cf. United States v. Morgan Guaranty Trust Co.,* 572 F.2d 36, 42 n. 9 (2d Cir.), *cert. denied, sub nom. Keech v. U.S.,* 439 U.S. 822, 99 S.Ct. 89, 58 L.Ed.2d 114 (1978) (taxpayer challenging agency investigatory action must make substantial preliminary showing of improper purpose on part of agency before even limited discovery need be ordered); *Mobil Oil Corp. v. Lefkowitz,* 454 F.Supp. 59, 71 (S.D.N.Y. 1977).

### First Amendment

Plaintiffs claim that defendant's activities have infringed their First Amendment rights. Their claims are directed to the Commission's investigation in connection with MUR 1852.

Plaintiffs Barrett and Allen charge that the FEC's failure to provide them with a sufficient factual basis for MUR 1852 when requesting information from them has chilled their First Amendment right "to participate in the electoral process", i.e., to make contributions to TLC, because they fear federal scrutiny of their political activities. Plaintiffs Spannaus, TLC and Henderson claim that the "inadequacy and untimeliness of notice [for MUR 1852] to Spannaus and TLC and the unauthorized investigation itself has severely frustrated the campaign's ability to raise funds ... for ... post-election activities" by chilling volunteer activity. Complaint, ¶¶ 54 and 55.

"It is well established that in all areas, including electoral regulations, the power to regulate must be exercised in such a manner as to avoid infringing on protected freedoms, especially those arising under the First Amendment." *Dolbeare v. Federal Election Commission,* No. 81 Civ. 4468, slip op. at 36, (S.D.N.Y. March 9, 1982). "[E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960); *Dolbeare v. Federal Election Commission, supra.* Because "[t]he subject matter which the FEC oversees ... relates to the behavior of individuals and groups *only insofar as they act, speak and associate for political purposes*", *FEC v. Machinists Non-Partisan Political League,* 655 F.2d 380, 387 (D.C.Cir.), *cert. denied,* 464 U.S. 897, 102 S.Ct. 397, 70 L.Ed.2d 213 (1981) (emphasis in original), the Commission's investigative authority is subject to "extra-careful scrutiny from the court". *Ibid; see FEC v. Fla. for Kennedy Com-*

*mittee,* 681 F.2d 1281, 1284 (11th Cir.1982) (activities that FEC seeks to investigate differ profoundly in terms of constitutional significance from the activities that are generally the subject of investigation by other federal administrative agencies, and thus receive "higher degree of scrutiny"). Yet "[e]ven a 'significant interference with protected rights of political association' may be sustainedif the [government] demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Buckley v. Valeo,* 424 U.S. 1, 25, 96 S.Ct. 612, 638, 46 L.Ed.2d 659 (1976) (quoting *Cousins v. Wigoda,* 419 U.S. 477, 488, 95 S.Ct. 541, 547, 42 L.Ed.2d 595 (1975)).

The Commission's activities in connection with MUR 1852 serve a significant governmental interest. *See Jones v. Unknown Agents of Fed. Elec. Commission,* 613 F.2d 864, 875–76 (D.C.Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980) (governmental interest in conducting field interviews of contributors to LaRouche campaign to determine whether campaign violated Act withstands exacting scrutiny); *cf. LaRouche v. Webster,* 566 F.Supp. 415, 418 (S.D.N.Y.1983) (while interviews conducted by FBI may discourage some political association, plaintiff's associational rights must give way to compelling governmental interest in investigating possible criminal activity). The Commission has a duty to administer and enforce the Act and Matching Fund Act to protect the integrity of the political process. *See California Medical Association v. Federal Election Commission,* 641 F.2d 619, 624 (9th Cir.1980). Having determined that there was reason to believe that contributions to TLC involved unauthorized credit card transactions which violated the Act and Matching Fund Act, *see* 2 U.S.C. § 434(b)(2) and (3) and 26 U.S.C. § 9042(c), the Commission requested information from contributors to TLC. *See* 2 U.S.C. § 437g(a)(2) (after making "reason to believe" finding, "[t]he Commission shall make an investigation of such alleged violation, which may include a field investigation"). It has not used intrusive means. It has mailed questionnaires to a number of contributors whose names TLC had already reported on the public record, and requested that they voluntarily provide the Commission with verification of the circumstances of their reported contributions. *Compare Jones v. Unknown Agents of Fed. Elec. Commission,* 613 F.2d at 877 (FEC investigators' approaches to contributors at home and at work not considered intrusive). To the extent that the Commission's investigation has "chilled" any volunteer activities on the part of contributors, thus hampering the campaign's activities, that chill does not under the circumstances rise to a constitutional claim. *See ibid.* (FEC investigators' approach of LaRouche contributors at home "before they left for work in the morning" or "later in the day at their workplaces", while having some chilling effect on contributors support of campaign, does not amount to violation of First Amendment rights). Plaintiffs have failed to allege facts sufficient to show that any "chill" experienced by plaintiffs Allen and Barrett is "more than the natural response that anyone would have if questioned by a federal agent about campaign contributions." *Ibid.*

### Conclusion

As plaintiffs have failed to make even a preliminary showing of bad faith on the part of the Commission, or to allege facts sufficient to show an infringement of their First Amendment rights, summary judgment is granted in favor of defendant Commission.

The Clerk is directed to enter judgment dismissing the complaint with prejudice and without costs.